## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## ANDERSON DIVISION

| | |
|---|---|
| PICKENS COUNTY BRANCH OF THE NAACP;<br><br>REBECCA TURNER and BRANDON TURNER, on behalf of minor children J.T. and G.T.;<br><br>SUSANNA ASHTON and PETER LAURENCE on behalf of minor children H.L. and C.L.;<br><br>REBA KRUSE and DERRICK KRUSE on behalf of minor children S.K. and R.K.;<br><br>        *Plaintiffs*,<br><br>    v.<br><br>SCHOOL DISTRICT OF PICKENS COUNTY;<br><br>        *Defendant*. | Case No. 8:23-cv-01736-BHH |

### Plaintiffs' Memorandum of Law
### In Support of a Preliminary Injunction

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

    I.     School District of Pickens County .................................................................2

    II.     *Stamped: Racism, Antiracism, and You* ........................................................2

        A.     *Stamped: Racism, Antiracism, and You* is age-appropriate for high school students. .........................................................................................3

        B.     *Stamped: Racism, Antiracism, and You* is educationally suitable and aligns with many South Carolina standards for English Language Arts....4

    III.     The Challenge to *Stamped: Racism, Antiracism, and You* in Pickens County ..6

        A.     Parental Challenges to *Stamped* ...................................................6

        B.     School-Level Review .....................................................................7

        C.     District-Level Appeal and Review .................................................8

        D.     Public comments explicitly politicized the Board's consideration of *Stamped.* ......................................................................................8

    IV.     Removal of *Stamped: Racism, Antiracism, and You* .......................................10

    V.     Removal of *Stamped* was instigated, championed, and celebrated by ultra-conservative political groups. ...........................................................................12

        A.     Moms for Liberty ........................................................................12

        B.     South Carolina Freedom Caucus .................................................14

        C.     Conservatives of the Upstate. .....................................................16

    VI.     Plaintiffs are harmed by SDPC's removal of *Stamped: Racism, Antiracism, and You.* .....................................................................................................17

LEGAL STANDARD.............................................................................................................18

ARGUMENT ..........................................................................................................................18

i

I.      Plaintiffs are likely to prevail in their claim that SDPC's removal of *Stamped: Racism, Antiracism, and You* violates the First Amendment..........................18

        A.      The First Amendment limits the authority of school officials to inhibit the free and robust exchange of ideas in classrooms and libraries. .....19

        B.      Defendant's decision to forbid use of *Stamped* in the classroom violates the First Amendment under *Kuhlmeier*..........................................21

        C.      Defendant's removal of *Stamped* from its libraries and media centers violates the First Amendment. .......................................................24

                1.      Defendant's removal of *Stamped* from SDPC libraries fails *Tinker*'s substantial-interference test. ..............................................24

                2.      Defendant's removal of *Stamped* from SDPC libraries violates *Pico*'s prohibition on removing library books based on personal, social, political, and moral views....................................................26

II.     Plaintiff will suffer irreparable harm unless the Court grants preliminary injunctive relief. ...............................................................................32

III.    The balance of hardships and public interest favor preliminary injunctive relief. .................................................................................................32

CONCLUSION...............................................................................................33

## INTRODUCTION

On September 26, 2022, the Board of Trustees for the School District of Pickens County ("SDPC" or the "District") voted unanimously to remove *Stamped: Racism, Antiracism, and You*—a young-adult book about the history of racist ideas in America—from every library, media center, and classroom in the District. The decision was not motivated by the book's educational suitability (two different review committees concluded that the book was aligned with dozens of state standards and highly suitable for use as an instructional resource) but by ideological opposition to the viewpoints articulated in the book and the Board's desire to suppress proliferation of those ideas among its student body. Following the District's action, Plaintiffs—six parents and one organization with members in the District—filed this lawsuit seeking declaratory and injunctive relief under the First Amendment.

The District's removal of *Stamped: Racism, Antiracism, and You* triggers First Amendment scrutiny because it infringes on the rights of students to access information in their libraries and classrooms. To pass constitutional muster, the District must demonstrate that its removal of the *Stamped* from the classroom was "reasonably related to legitimate pedagogical concerns," *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988), and that its removal from the library and media center was necessary to avoid "substantial disruption and interference with school activities and discipline," *Tinker v. Des Moines Comm. Sch. Dist.*, 393 U.S. 503, 511 (1969), and was not removed "because [the District] dislike[s] the ideas contained in those books and seek[s] by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982).

The District cannot meet its burden. The public record shows that board members took no interest in whether *Stamped* was educationally suitable for high school children. Instead, opposition to the *opinions* contained in the book—and a desire to suppress the proliferation and discussion of those ideas—motivated political groups to challenge the book and, in turn, drove

1

the Board's decision to remove the book. As the Supreme Court has said: "Such purposes stand inescapably condemned by our precedents." *Pico*, 457 U.S. at 872.

Because facts established in the public record show that Plaintiffs are likely to prevail on the merits of their First Amendment claim and are certain to suffer irreparable harm without emergency relief, the Court should grant Plaintiffs' Motion for Preliminary Injunction.

## STATEMENT OF FACTS

### I.     School District of Pickens County

The School District of Pickens County (the "District" or "SDPC") is responsible for administering public K-12 education in Pickens County, South Carolina. Under South Carolina law, the District is a "body politic and corporate" that "may sue and be sued." Ex. A (District Legal Status) (citing S.C. Code § 59-17-10). At present, the District is governed by an all-white, seven-member Board of Trustees (the "Board"). Current Board members are: Betty Bagley, Randy Robinson, Shannon Haskett, Brad Dover, Betty Garrison, Karla Kelley, and Amy Williams. The Board is responsible for "ensuring that students develop to their maximum personal and academic potential to prepare them for the future in the workforce and as responsible citizens." Ex. B (Board Operational Goals). The Board is also responsible for selecting the District superintendent and for approving and adopting textbooks for use in the school system. Under District policy, "[t]he board's first commitment in the selection and adoption of textbooks will be the preservation of the student's right to learn in an atmosphere of academic freedom." Ex. C (Textbook Selection and Adoption). The Board has ultimate and final authority for operating schools in the District. Ex. H (Board Powers and Duties).

### II.     *Stamped: Racism, Antiracism, and You*

*Stamped: Racism, Antiracism, and You* is a young adult adaptation of Ibram X. Kendi's award-winning book, *Stamped from the Beginning*—which traces the history of racist thought in

America.[1] Young adult author Jason Reynolds collaborated with Kendi to adapt the book to help make it accessible to young people.[2] *Stamped: Racism, Antiracism, and You* ("Stamped") is a #1 New York Times bestseller and has received book-of-the-year honors from *Parents Magazine* and *Publishers Weekly*, was awarded Best Children's Book of the Year by *Washington Post*, and was listed on *TIME Magazine*'s Ten Best Children's and Young Adult Books of the Year.

> A.    <u>*Stamped: Racism, Antiracism, and You* is age-appropriate for high school students.</u>

*Stamped* is written specifically for young adult readers; as author Jason Reynolds described, he "rewrote the book top to bottom" to ensure the subject matter is accessible to young people.[3] Readers and educators around the country have deemed the book appropriate for teen readers.[4] The National Education Association (NEA) categorizes it as a "young adult level" book and provides access to an educator guide, book club guide, and other classroom resources.[5] University of Madison-Wisconsin School of Education's Cooperative Children's Book Center

---

[1] *Stamped from the Beginning* is a highly regarded book on racist thought in America. It won the 2016 National Book Award for Nonfiction and the 2017 NAACP Image Award for Outstanding Literary Work – Nonfiction. It was a finalist for the National Book Critics Circle Award for General Nonfiction in 2016 and a nominee for the 2017 Hurston/Wright Legacy Award for Nonfiction. The young adult adaptation, *Stamped: Racism, Antiracism, and You*, was published by Kendi and celebrated young adult author, Jason Reynolds, in 2020.

[2] Jason Reynolds is a celebrated children's author – a "*New York Times* bestselling author, a Kirkus Prize winner, a two-time Walter Dean Myers Award winner, an NAACP Image Award winner, a National Book Award finalist, and the recipient of a Newbery Honor, a Printz Honor, multiple Coretta Scott King Award honors and a CILIP Carnegie Medal." Library of Congress, *Jason Reynolds, National Ambassador for Young People's Literature: Jason Reynolds at the Library*, https://guides.loc.gov/jason-reynolds/about. (last visited June 22, 2023).

[3] Annabel Gutterman, *Jason Reynolds and Ibram X. Kendi Are Teaming Up to Help Young People Navigate Racism*, TIME (Aug. 19. 2019), https://time.com/5650322/jason-reynolds-ibram-kendi-stamped-young-adult/.

[4] Scholastic classifies the book as appropriate for ages 12-18 or grades 7-12. SCHOLASTIC, https://shop.scholastic.com/parent-ecommerce/books/stamped-racism-antiracism-and-you-9780316453691.html. (last visited June 22, 2023).

[5] NEA, https://www.nea.org/professional-excellence/student-engagement/read-across-america/find-your-book/stamped-racism. (last visited June 22, 2023).

lists the book as appropriate for ages 12 and older, summarizing the book as "[f]requently speaking directly to young readers . . . Reynolds makes hard truths more accessible in the tone of a trusted friend breaking it down with honesty, and even occasional humor."[6] Keisha Rembert, assistant professor of teacher preparation at National Louis University in Chicago, told The New York Times that "Reynolds captures for young people the history and poignancy of Kendi's original work, but with a spark of relatability and pace necessary for them to grab onto."[7]

    B.     *Stamped: Racism, Antiracism, and You* is educationally suitable and aligns with many South Carolina standards for English Language Arts.

*Stamped* is widely recognized by educators as appropriate and relevant to classroom instruction.[8] The National Council of Teachers of English presented a conversation on *Stamped* with the authors and Dr. Sonja Cherry-Paul and encourages teachers to use the book for classroom instruction, including by providing an educator's guide developed by Dr. Cherry-Paul.[9] This guide encourages educators "to think about this text through the lens of their state-specific and national standards."[10]

As relevant here, *Stamped* also closely aligns with many of South Carolina Department of Education's ("SC DOE") standards for English Language Arts ("ELA"). SC DOE issues "Priority Standards," which include all required competencies that students should be proficient in by the end of the year, and "Support Standards," which connect to or support the Priority

---

[6] COOPERATIVE CHILDREN'S BOOK CENTER AT UNIVERSITY OF WISCONSIN-MADISON'S SCHOOL OF EDUCATION (June 8, 2020), https://ccbc.education.wisc.edu/stamped-racism-anti-racism-and-you/.

[7] Jackie Reeve, *14 Antiracist Books for Kids and Teens Recommended by BIPOC Teachers and Librarians*, WIRECUTTER (Nov. 16, 2020), https://www.nytimes.com/wirecutter/reviews/antiracist-books-for-kids-and-teens/.

[8] NEA, *supra* note 4. COOPERATIVE CHILDREN'S BOOK CENTER AT UNIVERSITY OF WISCONSIN-MADISON'S SCHOOL OF EDUCATION, *supra* note 5.

[9] NATIONAL COUNCIL OF TEACHERS OF ENGLISH (NCTE), *A Conversation With Jason Reynolds and Ibram X. Kendi*, https://ncte.org/stamped-resources/. (last visited Apr. 5, 2023). This educator's guide is available on the NEA website. NEA, *supra* note 4.

[10] NEA, *supra* note 4.

Standards. *See* Ex. E at 5 (ELA Priority and Support Learning Standards). Many of these standards relate to analyzing, interpreting, and responding to informational and persuasive writing. The skills required by SC DOE's ELA standards are directly aligned with the skillset students must use to read and understand *Stamped*.

Many of the standards governing English I-IV (high school English) require students to read, analyze, and evaluate informational and persuasive writing. For example, Standard RI.5 for English I and II requires students to "[d]etermine meaning and develop logical interpretations by making predictions, inferring, drawing conclusions, analyzing, synthesizing, providing evidence and investigating multiple interpretations" when reading informational texts. Ex. F at 2 (SCCCR Standards OnePager English 1). Additionally, Standard RI.10.1 for English I teaches students to identify when and how authors use rhetorical devices to advance their points of view, mandating that students understand how to "determine an author's point of view or purpose in a text and analyze how an author uses rhetoric to advance that point of view or purpose." *Id.* at 3. At the English III level, Standard RI.11.1 requires that students be taught to "analyze how point of view and author's perspective and purpose shape content, meaning, and style, supports rhetorical or aesthetic purposes, and conveys cultural experience." Ex. E at 90. A supporting standard requires students to be taught to analyze an author's use of "diction, conventions, figurative language, and/or language that is particularly fresh, engaging, or beautiful." *Id.* at 91.

To develop the skills required by these ELA standards and others, students in South Carolina public schools must read texts that exemplify these qualities and provoke discussions pertinent to these standards. *Stamped* blends historical evidence, persuasive rhetoric, and accessible style to explore American identity through the lens of race, specifically by discussing historical events like the Revolutionary War, the Civil War, World War I and II, *Brown v. Board of Education*, and more, while introducing readers to historical figures such as Thomas Jefferson, John C. Calhoun, Frederick Douglass, Marcus Garvey, Angela Davis, and others. *Stamped* provides ample opportunities for high school teachers and students to explore and apply the State's ELA reading standards to their understanding of the text.

English III's inquiry-based literacy standards require students to form ideas, questions, and reactions to the texts they read. Standard I.2 requires students to "[t]ransact with texts to formulate questions, propose explanations, and consider alternative views and multiple perspectives." Ex. G at 1 (SCCCR Standards OnePager English 3). Supporting standard I.3.2 requires English III students to "[e]xamine historical, social, cultural, or political context to broaden inquiry and create questions." *Id.* And English III's communication-based standard C.1 mandates that students "[i]nteract with others to explore ideas and concepts, communicate meaning, and…build upon the ideas of others to clearly express one's views while respecting diverse perspectives." *Id.* at 5.

*Stamped* offers many opportunities for teachers and students to apply these inquiry- and communication-based standards, among others. In the first pages, for example, the text states: "This is a present book. A book about the here and now. A book that hopefully will help us better understand why we are where we are as Americans, specifically as our identity pertains to race."[11] This short excerpt alone implicates these ELA standards, as it encourages readers to consider their own identity along with the identities and perspectives of others who may differ from them. By use of the text's exploration of historical events and figures, readers go on a journey to examine history and the social, cultural, and political context framing it to identify and understand their own views in the present time.

Across all high school grades, *Stamped* is an appropriate and helpful text for students and teachers to explore within the standards required by the State.

III.     **The Challenge to *Stamped: Racism, Antiracism, and You* in Pickens County**

A.  <u>Parental Challenges to *Stamped*</u>

In August 2022, three parents complained of the use of *Stamped* in SDPC at D.W. Daniel High School ("D.W. Daniel" or "the High School"). One parent-challenger, Susan Jo Van Fleet,

---

[11] Jason Reynolds and Ibram X. Kendi, *Stamped: Racism, Antiracism, and You* at 2 (2020).

argued that although she had not read *Stamped*, it should be removed from any public school or public library because it "promote[s] socialism." Ex. H at 15 (Board Packet). Another challenger, Amanda Hollensbe, argued that "no one should read [*Stamped*]" because it "demonstrates radical Marxism infecting our schools and our culture." *Id.* at 5. Ms. Hollensbe attached many pages of supporting materials to her challenge and argued that the book's existence in District schools violated South Carolina's supposed "anti-CRT" budget proviso. *Id.* Jessica Rae Martin, the third challenger of *Stamped* at D.W. Daniel, argued it should be removed because it constitutes "objectible [sic] indoctrination" and complained of the author's use of the word "basically" to insert his own interpretation of an event or subject. *Id.* at 17.

      B.    <u>School-Level Review</u>

     In accordance with the District's policy for challenging instructional materials, Ex. I (Policy IJ-R), the High School convened a committee to resolve the challenges, Ex. H at 22-24. The committee reviewed relevant materials, including the parent complaints, the South Carolina ELA standards, and Budget Proviso 1.105. *Id.* It then spoke directly with the English teacher who was using the text. Following this review, the committee concluded that (1) the way *Stamped: Racism, Antiracism, and You* was being used "does not amount to inculcating students into any theory or perspective[,]" and (2) the proposed use of *Stamped* "aligns with SC ELA standards." *Id.* at 22. The school-level committee unanimously agreed that the text was developmentally appropriate and that it enables students to "analyze accuracy, tone, argument, and bias[.]" *Id.* The full committee then recommended that *Stamped* should remain as a resource available to students at D.W. Daniel, "whether in a classroom or on a bookshelf." *Id.* In support of this conclusion, the committee cited 27 ELA standards that are furthered by reading and analyzing *Stamped*, including reading, writing, communication, and literary-based standards. *Id.* at 22-24.

C.    District-Level Appeal and Review

Following this determination, one parent-complainant—Amanda Hollensbe—appealed the decision of the school-level committee to the District. *See* Ex. H at 25-27. In response to her appeal, the District superintendent convened a district-level review committee. *See* Ex. H at 28; Ex. I ("If the parent . . . appeal[s] the decision of the school-level board of review . . . The district superintendent will appoint a district-level board of review."). This committee—comprised of a district-level curriculum coordinator, a media specialist/instructional coach in the school district, a teacher with special competence in the questioned field, a parent of a child enrolled in the school, and a superintendent's own designee, Ex. I—reviewed the parent's complaint and appeal, read the entirety of *Stamped*, and reviewed the school-level findings and response. Ex. H. at 28-29. Following this review, the district-level committee unanimously voted that *Stamped* should be approved as a classroom instructional resource for high school students. *Id.*  The book was approved as either a "choice selection" or a "whole-class instruction" with an alternate assignment. *Id.* The committee also agreed that *Stamped* is an appropriate resource for high school classrooms, libraries, and media centers. *Id.* The committee noted that "[t]he teacher's communicated purpose for use and alignment with the standards is important to articulate the intent for selection of this book," and unanimously "agreed [with the school-level committee] that [*Stamped*] is developmentally appropriate for high school students to analyze accuracy, tone, argument, and bias." *Id.*

D.    Public comments explicitly politicized the Board's consideration of *Stamped.*

Ms. Hollensbe submitted her initial challenge to *Stamped* on August 22, 2022—the same day the Board was scheduled to hold its monthly public meeting. *See* Ex. H at 6. Although D.W. Daniel had only just received the challenge and there was not yet any reason for the Board to know about the challenge, several members of the public were in attendance that evening to express their own disapproval of *Stamped*. Notably, many speakers were political actors who couched their strident opposition to *Stamped* in explicit political and ideological terms.

Matthew Kutelik, for example, recently lost a Republican primary bid to serve in the State House. Mr. Kutelik told the Board he would "fight to the death to ensure that [his] daughters and the sons and daughters of the people in [the] crowd . . . are not being indoctrinated by a racist, anti-American, Marxist ideology perpetrated by Ibram X. Kendi." SDPC Board of Trustees Meeting (In-Person) – 8/22/22 ("8/22/22 Board Meeting") at 1:20:28.[12] He then addressed the Board saying, "I ask you to fight the same and do the same thing." *Id.* at 1:20:46. Mr. Kutelik's campaign website for his State House campaign shares his views on local school issues, arguing that "[t]he purpose of schools is not indoctrination of the latest woke and destructive ideology."[13]

Another South Carolina politician, Thomas Beach, a freshman state representative from Pickens County, appeared to share his own strong opposition to *Stamped*. 8/22/22 Board Meeting at 1:25:26. Mr. Beach identified himself as a member of the Freedom Caucus and warned the Board that, unless it removed Stamped, it could face adverse action from the Freedom Caucus. *Id.* at 1:26:48. Another speaker echoed this political opposition, arguing that "critical race theory…[is] a neo-Marxist theory" with a goal of "hav[ing] a Marxist revolution." *Id.* at 1:31:23. One speaker, Johnelle Raines, who is affiliated with the political organization Conservatives of the Upstate ("COTU"), voiced her belief that District teachers, principals, and administrators are "ignoring the law" by asking students to read and discuss *Stamped*. *Id.* at 1:15:15. Raines, along

---

[12] Last accessed June 26, 2023:
https://www.youtube.com/live/foSnC9OaF9E?feature=share&t=4828.

[13] Matthew Kutilek for State House, "Where I Stand On Local Issues Specific to District 4" (last accessed June 26, 2023: https://votematthewkutilek.com/).

with Board Member Amy Williams, have voiced their concerns about challenged books on the COTU website.[14]

Following community comments, Board Member Kelley opened the discussion up for comments from the Board. During this conversation, Board Member Williams shared she "[has] extremely strong political leanings" and "most people in this room know which way I lean." 8/22/22 Board Meeting at 1:54:26. She said that she agreed with two of the speakers, including the original book challenger, Ms. Hollensbe. *Id.*

## IV.    Removal of *Stamped: Racism, Antiracism, and You*

The Board voted on Ms. Hollensbe's District-level challenge to *Stamped: Racism, Antiracism, and You* on September 26, 2022. Prior to the vote, the Board again heard public comments on the issue of whether Stamped should be available to students in the District. SDPC Board of Trustees Meeting (In-Person) – 9/26/22 ("9/26/22 Board Meeting") at 1:22:00.[15]

Like the month before, political conservatives showed up to oppose *Stamped* based on their ideological opposition to the views expressed in the book. 9/26/22 Board Meeting at 1:22:00. Heather Mitchell—Chair for the Pickens County chapter of Moms for Liberty, a conservative political group that advocates for the removal of books nationwide, *see infra*— expressed her opposition to *Stamped*. *Id.* at 1:22:20. Ms. Mitchell argued that the book is "political and biased to the point of being propaganda," and that it "openly embrac[es] Marxism." *Id.* at 1:23:32. She also said she opposed the book because it "idoliz[ed] Angela Davis," who she described as "a Marxist [and] member of the Communist Party USA." *Id.* at

---

[14] Johnnelle Raines, *Daniel High School Teacher's Note to Parents About the Book STAMPED*, <u>Conservatives of the Upstate</u> (Aug. 25, 2022) (available at: https://www.conservativesoftheupstate.com/2022/08/daniel-high-school-teachers-note-to.html); Amy Williams, *School Board Member Speaks Up About Inappropriate Books in SDPC*, <u>Conservatives of the Upstate</u> (Nov. 23, 2022) (available at: https://www.conservativesoftheupstate.com/2022/11/school-board-member-speaks-up-about.html).

[15] Last accessed June 26, 2023 at: https://www.youtube.com/watch?v=I4oy4tp1Oi8&list=PL74BF154C41BFD009&index=11

1:23:55. She argued the book "is putting a heavy thumb on the scale of a very divisive, controversial, and political topic" and warned the Board that if it voted to allow "Marxist ideology to become required reading," Moms for Liberty would campaign for a "liberty-minded candidate" to run against them in their next election. *Id.* at 1:24:50.

After receiving public comment, the assistant superintendent formally presented the District-level review findings to the Board for its consideration. *Id.* at 2:12:40. As discussed above, the District review committee unanimously concluded that the book was educationally suitable and ought to remain available as a classroom and library resource. *See* Ex. H at 28-29.

Following the assistant superintendent's presentation, and without mention of the assistant superintendent's presentation, Board member Phillip Bowers immediately moved to remove *Stamped* "from our classrooms and any use in our schools whatsoever for a period of five years." 9/26/22 Board Meeting at 2:13:53. That motion instantly received a second from Board member Brian Swords. *Id.* at 2:14:06. During the discussion on the motion, one Board member commented that "I don't think taxpayers should be paying [for *Stamped*]." *Id.* at 2:14:47. Another Board member remarked that the book isn't appropriate "anywhere in any school in any district." *Id.* at 2:16:08. Another Board member added that "I think we all agree this is an opinion piece. I read it. It doesn't belong in the classroom." *Id.* at 2:23:26. Board member Amy Williams specifically addressed the Supreme Court case, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982), but argued that even though the Court held that removing books is "tantamount to limiting someone's First Amendment right," it was irrelevant to the Board's decision because *Pico* was "back in 1982" and "we now have Amazon [and] public libraries."[16] *Id.* at 2:20:00. For those reasons, she advised her fellow Board

---

[16] America's first public library was established in South Carolina in 1698, almost 200 years prior to *Pico*. Estellene P. Walker, "*So Good and Necessary a Work": The Public Library in South Carolina, 1698-1980*, (Columbia: South Carolina State Library, 1981), pp. 1-4 (available at: http://www.libsci.sc.edu/histories/vts/epw01.html#:~:text=The%20first%20publicly%20supported%20library,Episcopal%20clergyman%20of%20that%20period.).

members that it was "clearly in our purview to decide if this [book] is appropriate or not." *Id.* at
2:20:45. The Board briefly discussed the possibility of allowing student access in the library with
signed and witnessed parental consent, but that motion was voted down. *Id.* at 2:18:30, 2:28:30.
After that was resolved, the Board voted 7-0 to completely remove *Stamped* from every District
library, classroom, and media center for a period of 5 years. *Id.* at 2:28:47.

Several important considerations were conspicuously absent from the Board's
deliberation. To start, District policy requires the Board's final determination to be "based upon"
the committee's report. *See* Ex. I ("The board of trustees will make a final recommendation
concerning the merit of the complaint based upon . . . [a] review of the district-level committee's
findings."). Despite that policy, the Board members completely ignored both the conclusions and
justifications conveyed by the committee's report. In fact, the committee's report and
conclusions were not mentioned by the Board at all. Board policy also requires the Board to
"carefully consider the rights, freedoms, and responsibilities of students, parents/legal guardians,
and teachers." Ex. C. Among those, Board policies especially highlight "the preservation of the
student's right to learn in an atmosphere of academic freedom" and the "rights of all students" to
receive instructional materials that "are aligned to the state-adopted learning standards." *Id.*
Again, the Board blatantly ignored these concerns—Board members never mentioned how
removing *Stamped* would infringe on academic freedom and failed to address *Stamped*'s
alignment with dozens of state learning standards.

## V.     Removal of *Stamped* was instigated, championed, and celebrated by ultra-conservative political groups.

### A.     Moms for Liberty

Several of the loudest voices that lobbied to remove *Stamped: Racism, Antiracism, and
You* were women who are formally affiliated with Moms for Liberty ("M4L"). Amanda
Hollensbe, one of the three original complainants and the only parent to challenge the school-

level review finding, is the secretary of the Pickens Branch of M4L.[17] Mitchell—Chair for the

Pickens County chapter of M4L, testified at the Board's September 26, 2022, meeting that

*Stamped* should be removed *because of* its political stances and threatened to work to oust any

Board member that voted to retain the book. 9/26/22 Board Meeting at 1:22:20 ("Say no to

*Stamped*, just like you would *Mein Kampf*.")

  Although Moms for Liberty cloaks its mission in anti-indoctrination "parents' rights"

rhetoric,[18] its national, state, and local campaigns show that the group is exclusively dedicated to

pressuring educators to adhere to the group's "socially conservative ideology. In service of that

mission, South Carolina chapters of M4L have pushed for the viewpoint-based removal of

dozens of books that span a number of topics, including books that discuss race (*The Bluest Eye*

by Toni Morrison), gun violence (*People Kill People* by Ellen Hopkins), sexism and Christian

fundamentalism (*The Handmaid's Tale* by Margaret Atwood), and sexuality (*All Boys Aren't*

*Blue* by George M. Johnson).[19] And despite portraying themselves as a grassroots organization

with minimal resources,[20] M4L has been embraced, endorsed, and financially supported by

---

  [17] Amanda Hollensbe on Twitter: "Thank you!  I'm the secretary for Moms for Liberty, Pickens County SC.  I love my joyful warrior M4L members!" (Jan. 6, 2023) (last accessed June 26, 2023 at: https://twitter.com/HollensbeAmanda/status/1611538874974765056?s=20).

  [18] *See* "Who We Are," Moms for Liberty (available at: https://www.momsforliberty.org/about/).

  [19] *See, e.g.*, Emma Parkhouse, *Teachers, librarians & parents argue banning books in HCS will hurt students*, ABC15 News (January 23, 2023) (available at: https://wpde.com/newsletter-daily/horry-county-teachers-librarians-parents-banning-booksstudents-library-english-moms-for-liberty-south-carolina).

  [20] *See, e.g.*, 74 Interview: Moms for Liberty Co-Founder Tina Descovich on Her Group's Stunning Growth, Facing Threats Herself as a School Board Member and Googling Koch Brothers (available at: https://www.the74million.org/article/74-interview-moms-for-liberty-cofounder-tina-descovich-on-her-groups-stunning-growth-facing-threats-herself-as-a-school-board-member-and-googling-koch-brothers/) (claiming that M4L is funded by small donations and selling t-shirts).

groups and figures like Ron DeSantis,[21] Glen Beck,[22] Leadership Institute,[23] and the Heritage Foundation.[24] [25]

   B.    South Carolina Freedom Caucus

The South Carolina Freedom Caucus ("SC Freedom Caucus") is an ultra-conservative special interest caucus in the South Carolina House of Representatives. SC Freedom Caucus is part of the "State Freedom Caucus Network," which helps to enlist "patriots" in state politics to fight for states' rights.[26] SC Freedom Caucus is comprised of twenty members, all of whom are white. In their brief existence, SC Freedom Caucus has bullied the Medical University of South Carolina into halting pediatric gender affirming care[27] and has advanced a bill that would make abortion punishable by the death penalty.[28]

---

[21] "Gov. Ron DeSantis had a salient message for [Moms for Liberty national summit attendees] . . . he is one of them."  Kathyrn Varn, *DeSantis to conservative Moms for Liberty: 'You gotta stand up, and you gotta fight.'* Tallahassee Democrat (July 15, 2022, 6:36pm), https://www.tallahassee.com/story/news/2022/07/15/desantis-praises-moms-liberty-education-campaign-summit/10029200002/

[22] In a video posted to the official Moms for Liberty Facebook account, Glenn Beck voices support for the group and declares "if you want a grassroots organization that is trying to stop what is happening into our schools, especially with CRT, Moms for Liberty...is doing that." Moms For Liberty, Facebook (May 24, 2021), https://www.facebook.com/Moms4Liberty/videos/glenn-beck-loves-moms-for-liberty/1024730941688808/

[23] Leadership Institute was the top sponsor of Moms for Liberty's 2022 National Summit. *See,* Dylan Craig, *Moms for Liberty Takes the National Stage,* Leadership Institute, (July 22, 2022) https://www.leadershipinstitute.org/news/?NR=16004

[24] Heritage Foundation, *Moms for Liberty Awarded Heritage's Salvatori Prize for Citizenship* (Jun 2, 2022) (available at: https://www.heritage.org/press/moms-liberty-awarded-heritages-salvatori-prize-citizenship).

[25] *See* Olivia Little, *Unmasking Moms for Liberty*, Media Matters for America (Nov. 12, 2021) (available at: https://www.mediamatters.org/critical-race-theory/unmasking-moms-liberty).

[26] State Freedom Caucus Network Website (available at: statefreedomcaucus.org).

[27] https://www.thestate.com/news/politics-government/article270044452.html

[28] https://www.thestate.com/news/state/south-carolina/article273183125.html

According to the State Freedom Caucus Network, "Critical Race Theory" is one of "the most important fights of today."[29] In South Carolina, SC Freedom Caucus fought to pass Budget Proviso 1.93, which purports to prohibit state money from funding the teaching of "Critical Race Theory." The SC Freedom Caucus even brought legal actions against two different school districts—Charleston and Lexington One—for allegedly violating that budget proviso.[30] In that lawsuit, SC Freedom Caucus takes square aim at Ibram Kendi (the author of *Stamped*) and his concept of antiracism. Specifically, the lawsuit alleges that "Critical Race Theory," "antiracism," "culturally responsive teaching, or diversity, equity, and inclusion," all violate Budget Proviso 1.93 and are all "the same pernicious, racist nonsense." Ex. J at 3. For the last two years, the SC Freedom Caucus has fought (so far, unsuccessfully) to pass a general law that would codify their anti-CRT budget proviso.[31]

Thomas Beach is a state representative from the Pickens area and a member of the SC Freedom Caucus. Representative Beach is committed to fighting against "left-wing indoctrination of our kids in schools."[32] To that end, Representative Beach appeared in person at the District's August 22, 2022, board meeting and warned the Board that they could face adverse action from the SC Freedom Caucus if they refused to remove *Stamped*. Ex. H at 1:26:45. Following the Board's vote to remove *Stamped*, Beach credited his own threats as the basis for the Board's decision:

---

[29] State Freedom Caucus, https://statefreedomcaucus.org/ (last visited June 22, 2023).

[30] *See S.C. Freedom Caucus v. Lexington Sch. Dist. One*, 2022-CP-3203931 (Nov. 16, 2022).

[31] *See* "South Carolina Transparency and Integrity in Education Act," HB3728 (available at: https://www.scstatehouse.gov/sess125_2023-2024/bills/3728.htm).

[32] Thomas Beach, *Op-Ed: The Reason Behind the Freedom Caucus*, Palmetto State Watch (Mar. 10, 2023) (available at: https://palmettostatewatch.com/op-ed-the-reason-behind-the-freedom-caucus-by-rep-thomas-beach/).



Big win in SC Pickens Co Schools. School Board removes material that taught students about oral sex and pushed CRT due to pressure from parents and threat of refund of taxpayer money for breaking state proviso laws signed by @SCFreedomCaucus members.

8:16 AM · Sep 27, 2022

C.    <u>Conservatives of the Upstate.</u>

Conservatives of the Upstate ("COTU") is another influential and ultra-conservative political organization that was directly involved in the District's removal of *Stamped*. From the beginning, COTU expressed public support for Amanda Hollensbe, one of the original challengers, on its website.[33] It also coordinated efforts to lobby the Board to remove *Stamped*. One of the board members, Amy Williams, wrote an article for the COTU website where she expressed her views about other challenged materials.[34] When the District voted to remove *Stamped*, COTU tweeted its celebration:



Unanimous decision to REMOVE the book STAMPED by our School Board! Pressure works! Thank you to all who wrote and called the SDPC Board members and told them that book must be REMOVED! And thank you Board Members for respecting SC law and listening to WE THE PEOPLE!

8:15 PM · Sep 26, 2022

---

[33] Johnnelle Raines, *Victory for WE THE PEOPLE at School Board Meeting*, Conservatives of the Upstate (Sept. 30, 2022) (available at: https://www.conservativesoftheupstate.com/2022/09/victory-for-we-people-at-school-board.html).

[34] Amy Williams, *School Board Member Speaks Up About Inappropriate Books in SDPC*, Conservatives of the Upstate (Nov. 23, 2022), https://www.conservativesoftheupstate.com/2022/11/school-board-member-speaks-up-about.html.

Even well after the book was removed, COTU continued to laud the decision and explain that it was removed because of the ideas the book contains.[35]

## VI.    Plaintiffs are harmed by SDPC's removal of *Stamped: Racism, Antiracism, and You*.

The District's removal of *Stamped* from its libraries, media centers, and classrooms infringes on the First Amendment rights of Individual Plaintiffs and members of the Pickens Branch of NAACP to access the information contained in *Stamped* and to attend schools where free, diverse, and critical thinking is embraced—not strangled.

Individual Plaintiffs each reside in Pickens County and are, because of their age, required "to attend regularly" the schools governed by the Defendant District. *See* S.C. Code § 59-65-10 (Compulsory School Attendance Act). Plaintiffs Rebecca and Brandon Turner are the parents and guardians of J.T., a minor child who is enrolled at D.W. Daniel High School, where *Stamped* was—until Defendant's actions—available to students in the library and assigned as a resource in at least one English III classroom. Turner Decl. at ¶ 2. Plaintiffs Susanna and Peter Laurence are the parents and guardians of H.L., a minor child who is also enrolled at D.W. Daniel High School. Laurence Decl. at ¶ 2. Plaintiffs Reba and Derek Kruse are the parents and guardians of S.K. and R.K., both of whom attend Pickens County High School, where *Stamped* was removed by District fiat. Kruse Decl. at ¶¶ 2-3.

Having compelled the attendance of Individual Plaintiffs, Defendant cannot orchestrate and enforce a scholastic environment where dogmatism reigns or otherwise take actions designed to "strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 637 (1943). Because the Board's removal of *Stamped: Racism, Antiracism, and You* on behalf of the District inappropriately attempts to prescribe what is orthodox in politics, nationalism, religion, or other

---

[35] Luke Campbell, *Is It Really Banning Books?*, Conservatives of the Upstate (Mar. 30, 2023) (available at: https://www.conservativesoftheupstate.com/2023/03/is-it-really-banning-books.html) (arguing that failing to remove *Stamped* would have been tantamount to "child abuse").

matters of opinion by restricting students' exposure to opinions on race that the Board disagrees with, Plaintiffs' rights under the First Amendment are violated. *See infra* Argument I.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is the opposing party, the last two factors may be considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020).

## ARGUMENT

I.    **Plaintiffs are likely to prevail in their claim that SDPC's removal of *Stamped: Racism, Antiracism, and You* violates the First Amendment.**

The District's removal of *Stamped: Racism, Antiracism, and You* infringes on Plaintiffs' First Amendment rights, was motivated by political desire to suppress specific ideas, and cannot be justified by any legitimate pedagogical interest. Secondary school students "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Tinker*, 393 U.S. at 511. To the contrary, "public schools have the duty to teach students that freedom of speech, including unpopular speech, is essential to our form of self-government." *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S.Ct. 2038, 2049 (2021) (Alito, J., concurring); *see also* Ex. G ("The board's first commitment . . . [is] the preservation of the student's right to learn in an atmosphere of academic freedom."). As the Supreme Court has warned, school dogmatism is antithetical to the First Amendment and will "strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 637 (1943).

Individual Plaintiffs and Plaintiff Pickens NAACP, through its associational members, have a First Amendment right to access information—like the ideas contained in *Stamped*—in

their classrooms and school libraries. *See, e.g.*, *Pico*, 457 U.S. at 866 (removal of books from school libraries); *Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) (curricular prohibition on certain materials and discussions in classrooms); *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 776 (8th Cir. 1982) (curricular prohibition on showing a particular film). To survive First Amendment scrutiny, the District must prove that its decision to prohibit use of *Stamped* in the classroom was "reasonably related to legitimate pedagogical concerns," *Kuhlmeier*, 484 U.S. at 273, and that its removal from the library and media center was necessary to avoid "substantial disruption and interference with school activities and discipline," *Tinker*, 393 U.S. at 511, and was not removed "because [the District] dislike[s] the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," *Pico*, 457 U.S. at 872. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

The District cannot satisfy its burden. Because the public record shows that SDPC's removal of *Stamped* was a naked and unjustifiable attempt to enforce political orthodoxy in the school library and classroom, Plaintiffs are likely to prevail on their claims that the decision to remove *Stamped* from classroom and library violated the First Amendment.

A.  The First Amendment limits the authority of school officials to inhibit the free and robust exchange of ideas in classrooms and libraries.

One hundred years ago, the Supreme Court established that neither students nor teachers "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506 ("This has been the unmistakable holding of this Court for almost 50 years.") (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)). In *Tinker*, the Court struck down a school's prohibition on wearing black armbands to protest the Vietnam War and announced a new test for evaluating restrictions on speech and expression in the school context: the First Amendment only permits schools to restrict speech that "materially and substantially disrupt[s] the work and discipline of the school." *Id.* at 513. Subsequently, *Tinker*'s "substantial-

19

disruption" test has been treated as "the basic constitutional framework" for evaluating the First Amendment's protections against school-based censorship. *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 435 (4th Cir. 2013); *see also B.L. by and through Levy v. Mahanoy Area Sch. Dist.*, 376 F. Supp. 3d 429, 435 (M.D. Pa. 2019) *aff'd*, 141 S. Ct. 2038 (2021) ("*Tinker* thus sets the baseline for what student speech is protected.").

In the intervening decades, "the Supreme Court has created three exceptions in which school officials may regulate student speech without undertaking *Tinker*'s substantial-disruption analysis." *Hardwick*, 711 F.3d at 435. The first was in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), where the Court held that a school may prohibit "offensively lewd," "obscene," and "vulgar," speech without establishing that such speech would result in a substantial disruption. *Id.* at 686. The second exception was announced in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), where the Court held that schools may exercise control over "school-sponsored expressive activities so long as its actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. Though the case arose from censorship of a school-sponsored school newspaper, *Kuhlmeier*'s discretionary standard has been extended to all curricular decisions that carry the imprimatur of the school itself. *See, e.g.*, *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517, 1521-25 (11th Cir. 1989) (applying *Kuhlmeier* to a school board's removal of two written works—*The Miller's Tale* and *Lysistrata*—from the eleventh and twelfth grade curricula). Finally, the Court established a third exception in *Morse v. Frederick*, 551 U.S. 393 (2007), where it held that a school may censor speech that "can reasonably be regarded as encouraging illegal drug use." *Id.* at 397. Unlike *Kuhlmeier*, which has been read broadly, *Morse* is a narrow opinion. As explained in a separate concurrence by Justice Alito and joined by Justice Kennedy, *Morse* "provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue." *Id.* at 422.

Taken together, the Supreme Court's school-based First Amendment jurisprudence consolidates into four rules: "(1) Under *Fraser*, a school may categorically prohibit lewd, vulgar or profane language; (2) Under *Kuhlmeier*, a school may regulate school-sponsored speech on

the basis of any legitimate pedagogical concern; (3) Under *Morse*, a school may categorically prohibit speech that can reasonably be regarded as encouraging illegal drug use; and (4) Speech falling outside of these categories is subject to *Tinker*'s general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others." *Mahanoy*, 376 F. Supp. 3d at 436 (marks omitted) (quoting *Saxe v. St. Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001) (Alito, J.)).

SDPC's prohibition on use of the book in the classroom is a curricular decision that, under *Kuhlmeier*, must be "reasonably related to legitimate pedagogical concerns." *See Virgil*, 862 F.2d at 1521. But the removal of *Stamped* from SDPC libraries and media centers is noncurricular, and thus must survive more rigorous scrutiny under the First Amendment. *See Pico*, 457 U.S. at 869; *see also Romano v. Harrington*, 725 F. Supp. 687, 690 (E.D.N.Y. 1989) ("*Pico* explains that inroads on the First Amendment in the name of education are less warranted outside the confines of the classroom and its assignments."); *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1202 (11th Cir. 2009) (refusing to apply the *Kuhlmeier* exception to removal of a book from the school library).

B.  Defendant's decision to forbid use of *Stamped* in the classroom violates the First Amendment under *Kuhlmeier*.

Local school authorities are generally entitled to broad discretion to decide what materials are taught in the classroom. But "notwithstanding the power and discretion accorded them, school boards do not have an absolute right to remove materials from the curriculum." *Pratt*, 670 F.2d at 776. Rather, local authorities must exercise their authority "in a matter that comports with the transcendent imperatives of the First Amendment," *Pico*, 457 U.S. at 864, which include, among other things, ensuring "wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, [rather] than through any kind of authoritarian selection," *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). *See also, e.g.*, *Barnette*, 319 U.S. at 642 ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics,

nationalism, religion, or other matters of opinion . . . If there are any circumstances which permit an exception, they do not now occur to us."). When school officials make curricular decisions that "run afoul of the Constitution," the federal courts "have not . . . hesitated to intervene." *Kuhlmeier*, 484 U.S. at 279 (Brennan, J., dissenting); *see also Pratt*, 670 F.2d at 776.

When, as here, a school board removes a material from curricular use, the board must show that its actions were "reasonably related to legitimate pedagogical concerns." *See Arce*, 793 F.3d at 983 (applying the test from in *Kuhlmeier*, 484 U.S. 260 (1988)); *Virgil*, 862 F.2d at 1521-22 (same); *McCarthy v. Fletcher*, 207 Cal. App. 3d 130 (Cal. Ct. App. 1989) (same); *see also Pratt*, 670 F.2d at 777 (requiring, before *Kuhlmeier*, that the school board "establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information."). This approach borrows from the Supreme Court's test in *Kuhlmeier*, where the Court held that a high school principal was permitted to censor two pages of a school-sponsored student newspaper because he believed its contents were inappropriate for the level of maturity of the intended readers. *Kuhlmeier*, 484 U.S. 260 (1988); *see Virgil*, 862 F.2d at 1521. *Kuhlmeier* reasoned that because the newspaper "might reasonably bear the imprimatur of the school," it "may be fairly characterized as part of the school curriculum." *Id.* at 271. After discussing the broad authority afforded to schools to control curricula, the Court held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273.

Under this rule, the District here must establish two factual elements: (1) that its removal decision was motivated *in fact* by a legitimate pedagogical concern; and (2) that its removal decision was reasonably related to that concern. *See, e.g.*, *McCarthy*, 207 Cal. App. 3d at 142-43 (applying *Kuhlmeier* and remanding for factfinding where "two rational but conflicting interpretations as to the motivation [of the board] may be drawn."); *see also Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875 (D. Kan. 1995) ("[T]he court must determine the 'actual motivation' of the school board members in their removal decision."); *Campbell v. St. Tammany*

22

*Par. Sch. Bd.*, 64 F.3d 184, 191 (5th Cir. 1995) (remanding for district court to determine the "actual motivation" behind the school board's book removal). Because they cannot establish either element, Defendant's removal of *Stamped* from SDPC classrooms violates the First Amendment.

Here, there is no evidence the Board's removal of *Stamped* was motivated by a legitimate pedagogical interest. As in *Pratt*,[36] the Board failed to identify "any cognizable, credible evidence as to any legitimate reason for excluding [*Stamped*] other than the fact that the School Board and certain elements of the populace objected to the ideas disseminated therein." *Pratt*, 670 F.2d at 778. Compared to the school- and District-level book review committees, which evaluated the text against the state curricular standards and considered the teacher's intended use of the book, Ex. H at 28-29, the Board's discussion ignored both the South Carolina's educational standards and the purpose of the book's inclusion in the curriculum, 9/22/26 Board Meeting at 2:13:53-2:28:47. Instead of any concern about educational suitability, the record shows that the Board prohibited *Stamped* in the classroom because of the opinions contained in the book. *See, e.g.*, *id.* at 2:23:26 ("[T]his is an opinion piece. I read it. It doesn't belong in the classroom."). To be clear, the book was not removed merely because it contained opinions—state standards *require* students to read and analyze persuasive and rhetorical writing. *See, e.g.*, Ex. E at 92 (English III Standards) ("Analyze and critique the reasoning in historical, scientific, technical, cultural, and influential argument writing."). Rather, *Stamped* was removed because the Board—like the politicians that lobbied for *Stamped*'s removal—wanted to suppress proliferation of the book's perspectives on race and power. Because there is no evidence that the

_____

[36] Although the Eighth Circuit's opinion in *Pratt* pre-dates *Kuhlmeier*, its analysis of nearly identical facts is still instructive. As here, the official book review committee in *Pratt* concluded that the challenged materials had educational value and recommended they remain in the curriculum. *Id.* at 778. As here, the Board in *Pratt* ignored the committee's recommendation and voted to remove the materials "without giving any reasons for its actions." *Id.* And as here, "[t]his approach inevitably suggests that the Board acted not out of its concern about [a post-hac rationale], but rather to express an official policy with respect to God and country of uncertain and indefinite content which is to be ignored by pupils, librarians and teachers at their peril." *Id.* at 779 (internal citations omitted).

Board was motivated by a legitimate pedagogical interest, there is no need to additionally consider whether removing *Stamped* is reasonably related to that concern.

    C.   <u>Defendant's removal of *Stamped* from its libraries and media centers violates the First Amendment.</u>

The First Amendment is far less tolerant of censorship in the library than it is in the classroom. *Romano*, 725 F. Supp. at 690 ("[I]nroads on the First Amendment in the name of education are less warranted outside the confines of the classroom and its assignments."). As a result, the District's decision to remove *Stamped* from SDPC libraries "must withstand greater scrutiny within the context of the First Amendment than would a decision involving a curricular matter."[37] *Campbell*, 64 F.3d at 189.

To Plaintiffs' knowledge, the Fourth Circuit has yet to resolve a First Amendment challenge to the removal of a school library book. As a result, this Court may apply one of two analytical frameworks for evaluating the District's removal of *Stamped*: *Tinker* or *Pico*. Under either standard, the District's decision violates the First Amendment.

        **1.**    **Defendant's removal of *Stamped* from SDPC libraries fails *Tinker*'s substantial-interference test.**

In *Hardwick*, the Fourth Circuit explained that all content- or viewpoint-based restrictions on speech in public schools are governed by *Tinker* unless the school's restriction falls within one of three exceptions. 711 F.3d at 435 ("*Tinker* provides the basic constitutional framework for reviewing student speech."). En route to this conclusion, *Hardwick* specifically denounced the Sixth Circuit's opinion in *Defoe v. Spiva*, 625 F.3d 324 (6th Cir. 2010), which treated a school's interest in "reducing racial tension" as comparable to the interest in *Morse* of preventing illegal

---

[37] Given that the District's removal of *Stamped: Racism, Antiracism, and You* from the classroom cannot survive scrutiny under *Kuhlmeier*'s more deferential test, *see supra* Part I.B., the book's removal from the library—which is subject to more rigorous scrutiny—must certainly violate the First Amendment. *See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009) (distinguishing curricular decisions from book-removal decisions) ("[T]his is not a school newspaper situation, and the speech at issue does not form part of a course of study in a school's curriculum. This is a school library book case.").

drug use. 711 F.3d at 435, n.11. The court explained: "While the Supreme Court is free to create exceptions to or even abandon *Tinker*'s substantial-disruption test, we must continue to adhere to the *Tinker* test in cases that do not fall within any exceptions that the Supreme Court has created until the Court directs otherwise." *Id.* (applying *Tinker* to a school's prohibition on wearing Confederate flag apparel).

That the infringement here is a restriction on student *access* rather than student *speech* is of no consequence. It is "well established" that the First Amendment not only protects the right to speak and express ideas, but also the corresponding the "right to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). This has been recognized "in a variety of contexts," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980), and is "'nowhere more vital' than in our schools and universities," *Kleindienst*, 408 U.S. at 763 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). *See also Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 686 (D. Me. 1982) (compiling cases) ("The full force of the reasoning in these cases is particularly apposite in the educational environment of the secondary school library."). As a result, a student's right to receive information must receive equal protection as their right to speak. *Pratt*, 670 F.2d at 779 ("What is at stake is the right to receive information and to be exposed to controversial ideas-a fundamental First Amendment right. If these films can be banned by those opposed to their ideological theme, then a precedent is set for the removal of any such work."); *see also, e.g.*, *Martin v. City of Struthers*, 319 U.S. 141, 146-47 (1943) (because the right to receive information is "so clearly vital to the preservation of a free society," it "must be *fully preserved*.") (emphasis added); *Stanley v. Ga.*, 394 U.S. 557, 564 (1969) ("This right to receive information and ideas, regardless of their social worth, is fundamental to our free society."); *see also Kreimer v. Bureau of Police for Town of Marrison*, 958 F.2d 1242, 1251 (3d Cir. 1992) (discussing the history of the right to receive information and applying it to public libraries).

Applying the Fourth Circuit's school-speech framework here, Defendant's removal of *Stamped* utterly fails. The record shows that the District's removal of *Stamped* is not based on

the book's obscenity or vulgarity, *Fraser*, 478 U.S. 675, nor on its endorsement of illegal drug use, *Morse*, 551 U.S. 393. And unlike its removal from the classroom, the District's removal of *Stamped* from the school library and media center is noncurricular and thus not subject to *Kuhlmeier*'s more deferential "legitimate pedagogical interest" standard. *ACLU of Fl.*, 557 F.3d at 1202. Because none of the Supreme Court's three exceptions to *Tinker* apply, Defendant's removal of *Stamped* from SDPC libraries must survive *Tinker*'s substantial-interference test, which it cannot. *Hardwick*, 711 F.3d at 434-37.

Under *Tinker*, "a mere desire to avoid discomfort and unpleasantness [is] an insufficient basis to regulate speech; there ha[s] to be disruption in the sense that the speech would materially and substantially interfere with . . . the operation of the school." *Kowalski v. Berkeley Cnty. Sch.*, 652 F.3d 565, 572 (4th Cir. 2011) (allowing discipline of student whose harassment and bullying of another student caused the other student to miss school). There is no evidence of such disruption here. To the contrary, *Stamped* was assigned reading in at least one English III classroom in the District, *see* Ex. H at 1, and did not cause any known instances of disruption or interference. Moreover, the views expressed in *Stamped* are no more disruptive, inflammatory, or divisive than the black armbands worn by John Tinker and his classmates to protest the Vietnam War, *Tinker*, 393 U.S. 503, or the Confederate flag shirts and protest shirts sought to be worn by Candice Hardwick, *Hardwick*, 711 F.3d 426. Because there is no evidence that *Stamped* has caused or will cause the sort of disruption contemplated by *Tinker*, the District cannot "prohibit the [availability] of one particular opinion," *id.*, by removing *Stamped* from its library shelves and media centers.

### 2. Defendant's removal of *Stamped* from SDPC libraries violates *Pico*'s prohibition on removing library books based on personal, social, political, and moral views.

The Fourth Circuit has yet to address a school's viewpoint-based removal of a library book, but the Supreme Court in *Pico* encountered facts strikingly similar to those asserted here. And although the First Amendment analysis in *Pico* commanded only a plurality of the Court,

26

the plurality's guidance has been routinely applied by lower courts. *See, e.g.*, *Case*, 908 F. Supp at 875.

In *Pico*, the U.S. Supreme Court considered a First Amendment challenge brought against a New York school district for removing "certain books from the school libraries and the curriculum." 457 U.S. at 857-58. The removals arose after the board received complaints from "a politically conservative organization of parents." *Id.* at 856; *see also Pico v. Bd. of Ed.*, 474 F. Supp. 387, 389 (E.D.N.Y. 1979). In response to the complaints, the board ordered that the books be preemptively removed and then appointed a committee to review the challenged books for educational suitability. *Id.* at 857-58. During the interim, the book-removal issue became highly politicized, with the board's conduct "insur[ing] that the impression would be created that freedom of expression in the District would be determined in some substantial measure by the majority's will." 638 F.2d 404, 416 (2d Cir. 1980). After its review, the book review committee concluded that several books were educationally suitable and recommended that nearly half of them be re-shelved. 457 U.S. at 857-58. But without further explanation, the board rejected the committee's recommendations and voted to remove nine books it believed contained "anti-American," "anti-Christian," and "just plain filthy." *Id.* at 857.

On summary judgment, the district court ruled for the school board, holding that the board's decision "did not sharply and directly implicate basic first amendment values," and was therefore "within the broad range of discretion constitutionally afforded to education officials." 474 F. Supp. at 398. The Second Circuit reversed, holding that the removal of materials from public school libraries triggers First Amendment scrutiny and that the school board was responsible for establishing that its action did not "unduly restricted protected speech to an extent greater than is essential." 638 F.2d at 416. Though one judge would have granted summary judgment for the plaintiffs, *id.* at 407, the majority concluded that, at minimum, remand was necessary "to develop a plenary record" concerning the board's motivation for removing the books and to provide plaintiffs "an opportunity to persuade a finder of fact that the ostensible justifications for defendants' actions—be it indecency or ungrammatical usage, as one defendant

suggested, or some other ground—were simply pretexts for the suppression of free speech." *Id.* at 417.

On *certiorari*, a plurality of the Supreme Court affirmed the Second Circuit.[38] In doing so, the Court announced a clear standard: a school board's authority to remove books from a school library may not be exercised in a narrowly partisan or political manner. Justice Brennan, writing for the plurality, explained that the school's discretion to the Court's precedent had "long recognized certain constitutional limits on the power of the State to control even the curriculum and classroom," 457 U.S. at 861, and that "the special characteristics of the school *library* make that environment especially appropriate for the recognition of the First Amendment rights of students," *id.* at 868 (emphasis in original). *See also Campbell*, 64 F.3d at 189. As a result, the plurality concluded that the general discretion afforded to local school authorities to set curricula is diminished in the context of the school library:

> Petitioners emphasize the inculcative function of secondary education, and argue that they must be allowed unfettered discretion to "transmit community values" through the Island Trees schools. But that sweeping claim overlooks the unique role of the school library. It appears from the record that use of the Island Trees school libraries is completely voluntary on the part of students. Their selection of books from these libraries is entirely a matter of free choice; the libraries afford them an opportunity at self-education and individual enrichment that is wholly optional.

*Pico*, 457 U.S. at 869.

---

[38] Justice Blackmun wrote separately, but agreed with the plurality that "school officials may not remove books from school libraries for the purpose of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved." *Pico*, 457 U.S. at 879-80 ("It does not seem radical to suggest that state action calculated to suppress novel ideas or concepts is fundamentally antithetical to the values of the First Amendment."). The would-be fifth vote, Justice White, agreed that the Court should affirm the Second Circuit's opinion reversing the district court and remanding for further factfinding regarding "the reason or reasons underlying the school board's removal of the books," but felt that Court "should not decide [the] constitutional questions until it is necessary to do so." 457 U.S. at 883-84 (White, J., concurring in the judgment). Importantly, however, there would be no purpose in remanding for factfinding if *no* facts could have established a violation of the First Amendment.

To explain its holding, the plurality offered two helpful examples of facts which, if proven, would undoubtedly violate the Constitution:

> If a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books. The same conclusion would surely apply if an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration.

*Pico*, 457 U.S. at 870-71.

Even the dissenters "cheerfully concede[d]" that such facts would violate the First Amendment. *See id.* at 908 (Rehnquist, J., dissenting) ("I would save for another day—feeling quite confident that that day will not arrive—the extreme examples posed in Justice BRENNAN's opinion").

The plurality summarized its rule in this way:

> In brief, we hold that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion. Such purposes stand inescapably condemned by our precedents.

*Pico*, 457 U.S. at 872.

Just as in *Pico*, the District's decision to remove *Stamped* violates the First Amendment. Like in *Pico*, the challenge to *Stamped: Racism, Antiracism, and You* was initiated and propelled by a politically conservative parent group—here, Moms for Liberty ("M4L")—with assistance from explicitly political groups and individuals, like Conservatives of the Upstate ("COTU"), and Freedom Caucus representative Thomas Beach. *Compare Pico*, 457 U.S. at 856 *with* Statement of Facts, Part V. Like the book challengers in *Pico*, challengers to *Stamped* chastised its contents as "anti-American," and "anti-Christian." *Compare Pico*, 457 U.S. at 857 *with, e.g.*, 8/22/22 Board Meeting at 1:20:28. Challengers especially emphasized their belief that *Stamped*

should be removed because of its supposedly Marxist[39] leanings. Ex. H at 5; 8/22/22 Board Meeting at 1:20:28, 1:31:23; 9/26/22 Board Meeting at 1:23:32. Like *Pico*, the challenge to *Stamped: Racism, Antiracism, and You* was overtly politicized during the District's evaluation of the book. *See Pico*, 638 F.2d at 416. Thomas Beach, a state representative from Pickens County, publicly warned the Board that refusing to remove the book would trigger the ire of the state's Freedom Caucus. Ex. H at 1:26:48. And following the District's decision to remove *Stamped*, political groups celebrated the decision as *their own victory*. *See supra* Statement of Facts, Part V. One Board member, Amy Williams, even posted a personal op-ed to the COTU website to discuss the "inappropriate" books available in the District.[40] Together, these facts leave the troubling and indelible impression "that freedom of expression in the District would be determined in some substantial measure by the majority's will." *Pico*, 638 F.2d at 416. Even the District's treatment of its book review committee mirrors *Pico*. Like in *Pico*, SDPC convened a committee to evaluate *Stamped*'s age appropriateness and educational suitability. Then, like in *Pico*, the Board of SDPC ignored and then overrode the committee's recommendation to retain *Stamped*. *Compare Pico*, 457 U.S. at 857-58 ("The Board substantially rejected the Committee's report.") *with* 9/26/22 Board Meeting at 2:13:53-2:28:47 (not discussing the committees' findings).

Taken together, the facts show that *Stamped* was removed for reasons that are impermissible under the First Amendment. The Board failed to articulate any basis for removing *Stamped* that was even nominally related to the book's educational suitability. Instead, vague comments by board members about the "opinions" in the book strongly indicate that they were embracing the explicit viewpoint discrimination of the groups and individuals that were pushing for removal. *See Pratt*, 670 F.2d at 778-79 (inferring from Board's lack of contemporaneous

---

[39] Marxist refers to "the political, economic, and social principles and policies advocated by [Karl] Marx." "Marxism," Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/Marxism. Accessed 6/6/2023.

[40] *Supra* note 14.

reliance on legitimate pedagogical interest that it was adopting the challengers' ideological opposition to the challenged material). Understood in that way, it is clear that *Stamped* was removed exclusively because of political hostility to the views and opinions expressed in the book and a desire to keep the District's students—including Plaintiffs—from being exposed to those opinions.

Although *Pico* was a plurality opinion, it has been treated as strongly persuasive authority in other circuits. The plurality largely adopted the reasoning of cases before it, *see, e.g.*, *Right to Read Def. Comm. V. Sch. Comm. of Chelsea*, 454 F. Supp. 703 (D. Mass. 1978), and its holding has continued to be applied in subsequent cases, *see, e.g.*, *Campbell*, 64 F.3d at 189 ("Even though the constitutional analysis in the *Pico* plurality opinion does not constitute binding precedent, it may properly serve as guidance in determining whether the School Board's removal decision was based on unconstitutional motives."). *See also Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875 (D. Kan. 1995).

Even courts that emphasize that *Pico* is nonbinding always stop short of rejecting its guidance. *See, e.g.*, *C.K.-W by and through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F.Supp.3d 906 (E.D. Mo. 2022) ("At this stage of the litigation, the Court will proceed under Justice Brennan's approach [in *Pico*]."). In *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009), for example, the Eleventh Circuit considered the First Amendment implications of a Miami school district's removal of *Vamos a Cuba*, a book about life in Cuba, from its school libraries. The court underscored that "*Pico* is of no precedential value," but refused to treat removal of a library book as equivalent to a discretionary curricular decision. *Id.* at 1200-02 (distinguishing *Kuhlmeier*, which addresses government speech and curricular decisions, *see supra* Part I.C.) ("[T]his is not a school newspaper situation, and the speech at issue does not form part of a course of study in a school's curriculum. This is a school library book case."). And at the end, the Eleventh Circuit (without explicitly saying so) functionally applied *Pico*: "the real issue for the federal courts . . .  is whether the Board's decision to remove the book from school library shelves was motivated by its inaccuracies concerning life in Cuba or by a desire to

31

promote political orthodoxy and by opposition to the viewpoint of the book." *Id.* at 1227; *but see id.* at 1202 ("The question of what standard applies to school library book removal decisions is unresolved.").

Given that *Pico* is well reasoned, routinely followed, and has been left undisturbed by the Supreme Court for the last 40 years, this Court would be on firm ground to apply it here. *See Case*, 908 F. Supp at 875 (concluding that the court "should follow the *Pico* decision" because it is "the only Supreme Court decision dealing specifically with the removal of books from a school library" and "there are no Tenth Circuit Court of Appeals decisions directly on point"); *but see supra* Part I.C.1 (explaining that, under Fourth Circuit's school speech precedent, this case is controlled by the substantial disruption test from *Tinker*).

## II.    Plaintiff will suffer irreparable harm unless the Court grants preliminary injunctive relief.

"The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). That is undoubtedly true in the Fourth Circuit, where First Amendment violations are treated as "*per se* irreparable injur[ies]." *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978); *see also In re Murphy-Brown, LLC*, 907 F.3d 788, 796 (4th Cir. 2018). Therefore, Plaintiff's likelihood of success establishes irreparable harm under *Winter*.

## III.    The balance of hardships and public interest favor preliminary injunctive relief.

Finally, Plaintiffs satisfy the third and fourth prong of *Winter* because the "balance of equities tips in their favor and that an injunction is also in the public interest." *Thomas v. Andino*, 613 F. Supp. 3d 926, 954 (D.S.C. 2020). "In cases involving significant public interest, courts may consider the balance of the equities and the public interest factors together." *Id.* (cleaned up). The Fourth Circuit has held that these "factors [are] established when there is a likely First Amendment violation," as is the case here. *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184,191 (4th Cir. 2013).

Unlike Plaintiffs, who have and continue to experience irreparable harm, Defendants are "in no way harmed by issuance of a preliminary injunction which prevents [them] from enforcing restrictions likely to be found unconstitutional." *Id.* (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)); *see also, Leaders of a Beautiful Struggle v. Baltimore Police Dep't,* 2 F.4th 330, 346 (4th Cir. 2021). Instead, "[t]he balance of equities . . . generally favors the constitutionally-protected freedom of expression." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012).

Furthermore, it is well established that the public interest favors protecting constitutional rights, such as the First Amendment rights at issue here. *See Giovani Carandola, Ltd.*, 303 F.3d at 521. That is especially true here, where the public maintains "an interest in public schools being able to teach students using a thoughtfully established curriculum." *Coble v. Lake Norman Charter Sch., Inc.*, 499 F. Supp. 3d 238, 249 (W.D. NC 2020)

## CONCLUSION

The discretion afforded to local school authorities is broad, but not unchecked. Whatever SDPC Board members personally feel about the ideas contained in *Stamped: Racism, Antiracism, and You*, they may not use their official authority to chill the proliferation of those ideas in the School District of Pickens County. Because Plaintiffs are likely to prevail on the merits of their claim and because the District's conduct irreparably harms the First Amendment rights of Plaintiffs, the Court should enter preliminary injunctive relief without bond.

Dated:  June 26, 2023

Respectfully submitted,

[*signature blocks on following page*]

**ACLU OF SOUTH CAROLINA**

*/s Allen Chaney*

_____

Allen Chaney
Fed. Id. 13181
P.O. Box 1668
Columbia, SC 29202
Tel: (843) 282-7953
achaney@aclusc.org

**NAACP**

Janette Louard*
Anna Kathryn Barnes*
Martina Tiku*
4805 Mt. Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org
abarnes@naacpnet.org
mtiku@naacpnet.org

* *Pro hac vice applications to be filed*