**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ANDERSON DIVISION**

|  |  |
|---|---|
| Pickens County Branch of the NAACP;<br><br>Rebecca Turner and Brandon Turner, on behalf of minor children J.T. and G.T.;<br><br>Susanna Ashton and Peter Laurence on behalf of minor children H.L. and C.L.;<br><br>Reba Kruse and Derrick Kruse on behalf of minor children S.K. and R.K.,<br><br>                    Plaintiffs,<br>       v.<br><br>School District of Pickens County,<br><br>                    Defendant. | Case No. 8:23-cv-01736-BHH |

**S**CHOOL **D**ISTRICT OF **P**ICKENS **C**OUNTY'S **R**ESPONSE IN **O**PPOSITION
TO **P**LAINTIFFS' **M**OTION FOR **P**RELIMINARY **I**NJUNCTION

NELSON MULLINS RILEY & SCARBOROUGH LLP

Miles E. Coleman
Fed. ID No. 11594
2 West Washington Street, Suite 400
Greenville, SC 29601
miles.coleman@nelsonmullins.com
(864) 373-2300

*Attorney for School District of Pickens County*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

    I.       District parents' objections to *Stamped* and the District's review procedure ............... 3

    II.     The Board's decision to remove *Stamped* .................................................... 4

    III.    Plaintiffs' delay in suing the district and moving for a preliminary injunction ............ 8

    IV.    The District reinstated *Stamped* in its high school libraries subject to parental consent ................................................................................................................. 8

LEGAL STANDARD ............................................................................................................... 9

ARGUMENT ........................................................................................................................ 10

    I.       The Court should deny the motion for preliminary injunction because Plaintiffs lack standing .................................................................................... 10

        A.      Both the Supreme Court and the Fourth Circuit require a plaintiff to allege more than future intentions that might "some day" result in an alleged injury ................................................................................... 11

        B.      Plaintiffs' declarations in this case express only a generic, inchoate desire potentially to read or study *Stamped* at some indefinite point in the future ........................................................................................ 15

    II.     Alternatively, the Court should deny the Motion for Preliminary Injunction because the *Winter* factors favor the District .............................................. 19

        A.      Plaintiffs cannot show that they are likely to suffer irreparable harm in the absence of preliminary relief ................................................. 19

        B.      Plaintiffs are not likely to succeed on the merits ............................. 21

            1.      The Board's decision to exclude *Stamped* from the District's curriculum does not violate the First Amendment ................................. 22

                a.     Under *Hazelwood*, the Board has broad discretion to regulate the District's curriculum .................................... 22

                b.     The Fourth Circuit, applying *Hazelwood*, has consistently held that a public school's governing body may dictate the school's curricula without violating the First Amendment .................................................................. 23

            2.      The Board's decision to exclude *Stamped* from the District's libraries does not violate the First Amendment ..................................... 24

a.    Despite Plaintiffs' reliance, *Pico* is not controlling precedent and is not dispositive on this case ................................25

b.    Under any of these standards, the Board did not violate the First Amendment because it removed Stamped because it contained factual inaccuracies .....................................26

C.    The balance of equities and the public interest do not favor issuing a preliminary injunction....................................................................................31

III.    Even if the *Winter* factors favored Plaintiffs, the Court should still deny the Motion for Preliminary Injunction because prospective injunctive relief is not available against the District ................................................................................32

CONCLUSION....................................................................................................................34

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
   557 F.3d 1177 (11th Cir. 2009) ....................................................13, 14, 15, 17, 25, 26, 27, 28

*Alabama v. Pugh*,
   438 U.S. 781 (1978) ........................................................................................................32

*Biggs v. North Carolina Dep't of Pub. Safety*,
   953 F.3d 236 (4th Cir. 2020) ...........................................................................................32

*Billups v. City of Charleston*,
   194 F. Supp. 3d 452 (D.S.C. 2016)....................................................................................9

*Bldg. Trades Employers' Educ. Ass'n v. McGowan*,
   No. 98 CIV. 4998 (MBM), 2000 WL 1471557 (S.D.N.Y. Oct. 3, 2000).............................26

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
   457 U.S. 853 (1982)...........................................................22, 24, 25, 26, 28, 29, 31

*Boring v. Buncombe County Bd. of Educ.*
   136 F.3d 364 (4th Cir. 1998) ......................................................................................21, 23

*Brookhaven Housing Coalition v. Kunzig*,
   341 F. Supp. 1026 (E.D.N.Y. 1972) .................................................................................21

*C.K.-W. by and through T.K. v. Wentzville R-IV School District*,
   619 F. Supp. 3d 906 (E.D. Mo. 2022)......................................................................27, 28, 29

*Calef v. Budden*,
   361 F. Supp. 2d 493 (D.S.C. 2005) ..................................................................................33

*Citibank, N.A. v. Citytrust*,
   756 F.2d 273 (2nd Cir. 1985)............................................................................................20

*Cox v. Anderson*,
   C.A. No. 4:21-cv-3797-MGL-TER, 2023 WL 1482693 (D.S.C. Jan. 9, 2023) ....................26

*Delaware Port Authority v. Transamerican Trailer Transp., Inc.*,
   501 F.2d 917 (3rd Cir. 1974) ...........................................................................................26

*Direx Israel, Ltd. v. Breakthrough Medical Corp.*,
   952 F.2d 802 (4th Cir. 1991) ...........................................................................................19

*Doe v. Obama*,
  631 F.3d 157 (4th Cir. 2011) ................................................................10, 13, 15

*E. Tenn. Nat. Gas Co. v. Sage*,
  361 F.3d 808 (4th Cir. 2004) ...............................................................................9

*Eldeco, Inc. v. Skanska USA Bldg., Inc.*,
  447 F. Supp. 2d 521 (D.S.C. 2006)......................................................................33

*Gantt v. Clemson Agr. Coll. of S.C.*,
  208 F. Supp. 416 (W.D.S.C. 1962)......................................................................26

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988)..............................................................................21, 22, 23

*Lee-Thomas v. Prince George's County Public Schools*,
  666 F.3d 244 (4th Cir. 2012) ..............................................................................32

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)....................................................10, 11, 12, 13, 15, 16, 18, 19

*Lydo Enterprises v. City of Las Vegas*,
  745 F.2d 1211 (9th Cir. 1984) .............................................................................21

*Magnussen Furniture, Inc. v. Collezione Europa USA, Inc.*,
  116 F.3d 472 ........................................................................................................20

*Majorica, S.A. v. R.H. Macy & Co.*,
  762 F.2d 7 (2nd Cir. 1985)...................................................................................20

*Muir v. Ala. Educ. Television Comm'n*,
  688 F.2d 1033 (Former 5th Cir. 1982) (en banc) (plurality opinion of Hill, J.) ....................25

*Presidents Council, District 25 v. Community School Board No. 25*,
  457 F.2d 289 (2nd Cir.), cert. denied, 409 U.S. 998 (1972) ....................................27

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
  872 F.2d 75 (4th Cir. 1989) .................................................................................21

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
  575 F.3d 342 (4th Cir. 2009) ..........................................................................9, 19

*Searcey v. Harris*,
  888 F.2d 1314 (11th Cir. 1989) ...........................................................................23

*Skehan v. Bd. of Trustees of Bloomsburg State College*,
  353 F.Supp. 542 (M.D. Pa. 1973) .......................................................................20

*Smith v. Sch. Dist. of Greenville Cnty.*,
    324 F. Supp. 2d 786 (D.S.C. 2004)..........................................................................33

*Stewart v. Laurens Cnty. Sch. Dist. No. 55*,
    No. 6–92–1603–3, 1992 WL 12014673 (D.S.C. Oct.2, 1992) (unpublished) ........................33

*Thomas v. Andino*,
    613 F. Supp. 3d 926 (D.S.C. 2020)..........................................................................31

*Vollette v. Watson*,
    No. 2:12-cv-231, 2012 WL 3026360 (E.D. Va. July 24, 2012)..............................................9

*Weinberger v. Romero–Barcelo*,
    456 U.S. 305 (1982)..........................................................................................31

*Wellin v. Wellin*,
    2013 WL 6175829 (D.S.C. 2013) ...........................................................................31

*Winter v. Nat'l Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................9, 19, 31, 32

*Ex Parte Young*,
    209 U.S. 123 (1908).........................................................................................32

**Rules**

Local Rule 7.06.....................................................................................................1

**Other Authorities**

*Black's Law Dictionary* 154 (8th ed. 2004)................................................................27

*Black's Law Dictionary* 1322 (8th ed. 2004)..............................................................27

Carnegie Library, *Race and Social Justice Books for Teens*, *available at*
    https://www.carnegielibrary.org/staff-picks/race-and-social-justice-fiction-for-
    teens/ (last visited July 10, 2023).....................................................................30

https://www.ibramxkendi.com/stampedbook (last visited July 10, 2023)......................................3

Nat'l Pub. Radio, *Ibram X. Kendi Recommends 6 Books to Help Your Kids
    Understand Race* (June 21, 2021), *available at* https://tinyurl.com/pm7zmvjj...................7, 30

*Random House Unabridged Dictionary* 1630 (2d ed.1993).........................................27

*Webster's New Twentieth Century Dictionary* 144–45 (1976)....................................27

<u>**INTRODUCTION**</u>

Pursuant to Local Rule 7.06 (D.S.C.), the School District of Pickens County (the "District") submits this response in opposition to Plaintiffs' Motion for Preliminary Injunction (ECF No. 7.) Preliminary injunctive relief is not warranted for multiple independent reasons.

*First*, Plaintiffs lack standing. None of them has alleged a sufficiently concrete and particularized injury to establish a constitutional case or controversy. The mere *possibility* that some of the Plaintiffs *might* read *Stamped* in English class next year or that they *might* in the future wish to check the book out from the high school library cannot satisfy their burden.

*Second*, Plaintiffs' extensive delays belie the urgency of their alleged irreparable injury. Plaintiffs waited seven months to file suit. They waited another month to serve the Complaint. They waited another month to file the pending Motion. And they waited three more days to alert the District's counsel of the Motion. The supposed exigency of Plaintiffs' last-minute request for expedited review of a long-foreseeable issue is a problem of their own making. Their lack of diligence should not be rewarded.

*Third*, Plaintiffs are not likely to succeed on the merits because the law does not support their claim. The Fourth Circuit and courts across the country have recognized that public school boards have extraordinarily broad discretion to select and remove materials from school curricula, even when those decisions are based on the materials' content or viewpoint. And neither the Supreme Court nor the Fourth Circuit has ever adopted the test Plaintiffs propose for the curation of public school libraries. Instead, Plaintiffs grasp for support in cases about *student* speech. Without controlling precedent clearly establishing their legal theory, Plaintiffs cannot show a likelihood of success on the merits.

*Fourth*, preliminary injunctive relief is inappropriate here because, even assuming Plaintiffs' legal theory was correct, the relief they seek rests on alleged facts that are contradicted

by the evidence. The legal test that Plaintiffs suggest this Court adopt requires them to prove that the decisive factor in the school board members' action was an intent to suppress ideas or viewpoints with which they disagree. Plaintiffs offer nothing to satisfy that test except for baseless speculation that *others*' motivations can be imputed to the board. But the evidence demonstrates otherwise: the board acted with legitimate pedagogical motivations and intent. Plaintiffs cannot establish a likelihood of success on the merits based on erroneous factual speculations.

*Fifth*, even if Plaintiffs' claim regarding the curation of public school libraries had support in controlling precedent, Plaintiffs still cannot demonstrate an injury—much less an irreparable one—because the book at issue ***is*** available to them in the District's high school libraries.

*Sixth*, the equities and the public interest do not favor a preliminary injunction here. An injunction would upend the status quo and thrust the Court into the role of school board, librarian, and curriculum coordinator, all to provide access to a book that is already available in the high school libraries and that is also available in multiple languages in hard copy, audio format, and electronic download from Plaintiffs' local public libraries, local bookstores, and online retailers. As to the public interest, the District and its stakeholders have an interest in maintaining local control of and accountability for the District and its schools by duly elected officials. The public interest is not served by an injunction that would invite more lawsuits from across the political and ideological spectrum seeking to use the federal courts as super-boards to second guess public school boards' curriculum and library decisions.

*Finally*, even if Plaintiffs could clear all of the foregoing hurdles, the Court still cannot grant the relief Plaintiffs seek. Prospective injunctive relief is not available when, as here, a plaintiff sues a state entity rather than a state official.

<u>BACKGROUND</u>

In 2020, the District acquired two copies of *Stamped: Racism, Antiracism, and You* ("*Stamped*"), by Ibram X. Kendi and Jason Reynolds. (*See* Declaration of Jessica Preisig ("Preisig Decl." ¶ 4, attached as **Exhibit A**.) The book is intended for young adults and, in the author's words, aims to "reveal[] the history of racist ideas in America." *See* https://www.ibramxkendi.com/stampedbook (last visited July 10, 2023). The authors (and Plaintiffs) emphasize that *Stamped* is not a normal history book. *See* Ibram X. Kendi & Jason Reynolds, *Stamped* 1 (2020); (*see also* Compl. ¶¶ 25–26, ECF No. 1). Rather, they say, it is a book that talks about history only from the authors' perspective of exposing racist ideas in America. *See Stamped* at 1; (*see also* Compl. ¶¶ 26–30, ECF No. 1). Plaintiffs concede that, in pursuit of this goal, the authors of *Stamped* do not give a "neutral" account of history. (Compl. ¶ 29, ECF No. 1.) That, perhaps, could be expected in an advocacy piece. And, in the District's view, it could even be forgiven—if the historic account were at least objectively accurate. But when a book's account of history strays from the facts, even if in furtherance of a persuasive aim, questions regarding its educational suitability arise.

## I.    District parents' objections to *Stamped* and the District's review procedure.

In August 2022, three Pickens County parents formally expressed concerns regarding the use of *Stamped* at D.W. Daniel High School.  (Compl. ¶ 81, ECF No. 1.)  These concerns initiated a review process established by District policy. Specifically, the District's Policy Manual provides a procedure by which a parent/guardian may challenge a book used in a District school. (*See* Policy IJ-R, attached as **Exhibit B**.) Under this procedure, a parent or guardian may complete a "Parent/Legal Guardian Request for Reconsideration of Instructional Materials" (a form known as "IJ-E") which is sent to the superintendent, principal, and teacher whose material is under criticism. (*Id.*) The principal then appoints a school-level board of review, which completes a

review of the challenged material and submits a written report of its findings to the principal. (*Id.*) If the parent or guardian wishes to appeal the decision of the school-level board of review, she may request a review by a district-level committee. (*Id.*) The District superintendent will then appoint a district-level board of review which completes a review and submits a written report. (*Id.*) Upon receipt of findings of the district-level committee, the parent or guardian may appeal the district-level committee decision to the School District of Pickens County Board of Trustees (the "Board"). (*Id.*) The Board will then make a final recommendation concerning the merit of the complaint. (*Id.*) The Board evaluates and considers the two committees' findings and conclusions but is not bound by them. (*Id.*)

In August 2022, three parents submitted IJ-E forms objecting to the use of *Stamped* at D.W. Daniel High School. (Compl. ¶ 81, ECF No. 1.) One of the complainants appealed from the school-level committee decision to the district-level committee, and, subsequently, to the Board. (*Id.* ¶¶ 90–96.)

## II.     The Board's decision to remove *Stamped*.

The District's seven-member, elected Board of Trustees includes business leaders, community servants, and educators. Their experience and credentials pertaining specifically to education are particularly extensive. Collectively, members of the Board have earned two PhDs in educational leadership, three Master's of Education degrees, a Master of the Arts in education, and an Educational Specialist degree. (*See* Declaration of Betty Bagley ("Bagley Decl.") ¶ 2, attached as **Exhibit C**; Declaration of Betty Garrison ("Garrison Decl.") ¶ 2, attached as **Exhibit D**; Declaration of Brian Swords ("Swords Decl.") ¶ 2, attached as **Exhibit E**.) Others have earned Master's degrees in yet other fields.

Together, the Board's members have 128 years of professional experience in education, where they have served as teachers, guidance counselors, curriculum assistants, curriculum coordinators, assistant principals, principals, district supervisors, and adjunct faculty members teaching education at four universities. (*See* Ex. C, Bagley Decl. ¶¶ 4–6, 9; Ex. D, Garrison Decl. ¶¶ 3–4; Ex. E, Swords Decl. ¶¶ 4–7; Declaration of Phillip Bowers ("Bowers Decl.") ¶ 4, attached as **Exhibit F**.) One Board member spent 23 years as a superintendent—winning the South Carolina Superintendent of the Year award in 2008 and a lifetime achievement award in 2013—and has served as a consultant at the South Carolina Department of Education. (*See* Ex. C, Bagley Decl. ¶¶ 6–7.) Another has spent decades as a university administrator.  (*See* Ex. E, Swords Decl. ¶¶ 5–6.)  A third has served on the South Carolina Board of Education and on the Education Oversight Committee. (*See* Ex. F, Bowers Decl. ¶ 4.)

On August 22, 2022, the Board held its monthly meeting and received public comments, most of which concerned the current challenge to the use of *Stamped* at D.W. Daniel High School. (Compl. ¶¶ 97-98, ECF No. 1.) The Board heard public comments both supporting and opposing the use of *Stamped*. *See* SDPC Board of Trustees Meeting (In-Person) — 8/22/22 ("8/22/22 Board Meeting"), https://tinyurl.com/5hwze3y9, at 1:10:50–1:41:50). Some of the commentors expressed disagreement with the ideas or viewpoints in the book. *Id*. The Board's members primarily listened. None expressed any disagreement with the book's ideas or viewpoints. The only one who voiced her view of *Stamped* during that meeting explained that she disapproved of the book not because of its ideas or viewpoints, but because she found numerous factual errors when reading it and, as a result, determined it did not meet the standard of educational rigor required for the schools. *Id*. at 1:56:18–1:59:23.

On September 26, 2022, the Board held its monthly meeting and received the findings of the District-level book review committee. (Compl. ¶ 107, ECF No. 1.)  During this meeting, one Board member moved to allow access to *Stamped* only with parental consent, which received two votes. (*Id.* ¶¶ 118–19) Ultimately, the Board voted to remove *Stamped* from the curriculum, library, and media centers of the District's high schools. (*Id*. ¶ 120.)

In deciding how to vote, the Board members considered the school-level and District-level committees' findings, conclusions, and recommendations regarding the use of *Stamped*. (*See* Ex. D, Garrison Decl. ¶ 9; Declaration of Shannon Haskett ("Haskett Decl.") ¶ 5, attached as **Exhibit G**; Declaration of Karla Kelley ("Kelley Decl.") ¶ 5, attached as **Exhibit H**; Ex. E, Swords Decl. ¶ 10; Ex. C, Bagley Decl. ¶ 12.)  The Board also carefully considered the rights, freedom, and responsibilities of students, parents and legal guardians, and teachers in the District. (*See* Ex. D, Garrison Decl. ¶ 10; Ex. H, Kelley Decl. ¶ 6; Ex. G, Haskett Decl. ¶ 6; Ex. E, Swords Decl. ¶ 11; Ex. C, Bagley Decl. ¶ 13.)  Their evaluations and conclusions were based on the school-level and District-level committees' reports, input from stakeholders, and the Board members own independent evaluation of the book, its educational suitability, and the potential for disruption of the educational environment. (*See* Ex. D, Garrison Decl. ¶ 11; Ex. H, Kelley Decl. ¶ 7; Ex. G, Haskett Decl. ¶ 7; Ex. E, Swords Decl. ¶ 12.)

The Board's votes were not based on disagreement with the ideas contained in *Stamped*, but on the Board members' conclusions that, because of factual errors and omissions in the book, it was not intellectually appropriate or educationally suitable for students in the District. *See* 8/22/22 Board Meeting, https://tinyurl.com/5hwze3y9, at 1:56:18–1:59:23 (Ms. Williams: "I too read the book, most of it . . . I just found error after error after error.  Errors of omissions.  Errors of commission . . . .  What we really need to focus on here is . . . does this material meet the

educational rigor that's required for one of the best school systems in our state.");[1] (*see* Ex. D, Garrison Decl. ¶ 13; Ex. H, Kelley Decl. ¶ 9; Ex. G, Haskett Decl. ¶ 9; Ex. E, Swords Decl. ¶ 14.)

Though the Board voted to remove *Stamped* from the curriculum, library, and media centers of the District's high schools, the Board members do not object to the *ideas* that *Stamped* attempts to explore. They do not object to books, materials, ideas, or discussion in the District's curriculum and libraries regarding race, racism, slavery, the civil rights movement, and historic or contemporary issues and tensions regarding race, racism, and justice, as long as those books, materials, ideas, or discussions are intellectually appropriate, age appropriate, and educationally suitable for the students of the District. (*See* Ex. D, Garrison Decl. ¶ 12; Ex. H, Kelley Decl. ¶ 8; Ex. G, Haskett Decl. ¶ 8; Ex. E, Swords Decl. ¶ 13; Ex. C, Bagley Decl. ¶ 14.)

Indeed, the District's high school libraries are full of such books, including ones about contemporary issues of race, racism, the black experience in America, and police violence; books about slavery in America—including biographies and personal narratives of enslaved people; books about the abolition movement; books about the civil rights movement, including multiple books by or about Dr. Martin Luther King, Jr.; multiple books about Malcolm X, including his autobiography; books about black social leaders and activists; and over a dozen books by Jason Reynolds (the co-author of *Stamped*), including his novels exploring contemporary issues of race and racism in America. (*See* Ex. A, Preisig Decl. ¶ 9.)   These books represent various perspectives, viewpoints, and ideas. In fact, the District's high school libraries contain books that

---

[1] Ms. Williams also noted, correctly, that the book is available at the local public library and from online retailers. *See* SDPC Board of Trustees Meeting (In-Person) — 9/26/22 ("9/26/22 Board Meeting"), https://tinyurl.com/bdemmwwm, at 2:19:50-2:20:43; *see also* Pickens County (SC) Library Catalog, https://tinyurl.com/ca4r626a (last visited July 10, 2023) (noting that Stamped is available for free to Pickens County residents in English or Spanish, and in hard copy, eBook download, DC, or audio book format).

the author of *Stamped* has himself recommended for young adults interested in learning about race, racism, and antiracism in America. *See* Nat'l Public Radio, *Ibram X. Kendi Recommends 6 Books to Help Your Kids Understand Race* (June 21, 2021), https://tinyurl.com/pm7zmvjj; (Ex. A, Preisig Decl. ¶ 10).

### III.    Plaintiffs' delay in suing the district and moving for a preliminary injunction.

Many months later, Plaintiffs filed suit, claiming that the Board's vote of September 26, 2022 violated the First Amendment. (*See* Compl., ECF No. 1.)  They subsequently moved for preliminary injunctive relief related to that same vote on September 26, 2022 in which the Board voted to remove *Stamped*.  (*See* Pls.' Mem. L. Supp. Prelim. Inj., 4, ECF No. 7-1.)  Notably, seven months had elapsed between the time of the Board's vote and the time Plaintiffs filed their Complaint on April 26, 2023.  (*See* Compl., ECF No. 1.)  Another month passed before Plaintiffs served the Complaint on May 26, 2023.  (*See* Def.'s Waiver of Service, ECF No. 6.)  And another month passed after that before Plaintiffs moved this Court for a preliminary injunction on June 26, 2023—nine months after Plaintiffs allege that they were irreparably harmed.  (*See* Pls.' Mot. Prelim. Inj., ECF No. 7.)  Plaintiffs' counsel waited three more days after that to serve the District's counsel with their Motion for Preliminary injunction on June 29, 2023, leaving the District with six business days (after excluding weekends and a federal holiday) to prepare and file this Response. (*See* Certificate of Service, ECF No. 8.)

### IV.    The District reinstated *Stamped* in its high school libraries subject to parental consent.

On July 6, 2023, the Board voted to allow access to Stamped in the District's high school libraries subject to parental consent.  (*See* Board of Trustees—Report of Findings (July 6, 2023), attached as **Exhibit I**; Ex. D, Garrison Decl. ¶ 14; Ex. H, Kelley Decl. ¶ 10; Ex. G, Haskett Decl. ¶ 10; Ex. C, Bagley Decl. ¶ 16.)  This decision mirrors a motion that was made during the Board

meeting of September 26, 2022.  (*See* Ex. D, Garrison Decl. ¶ 14; Ex. H, Kelley Decl. ¶ 10; Ex. G, Haskett Decl. ¶ 10; Ex. C, Bagley Decl. ¶ 16.) Since September 26, 2022, the Board had continued to discuss the issue, considered the perspectives of new Board members, and continued to evaluate input from parents and other stakeholders.  (*See* Ex. D, Garrison Decl., ¶ 14; Ex. H, Kelley Decl. ¶ 10); *see* SDPC Board of Trustees Meeting (Virtual) — 7/6/23 ("7/6/23 Board Meeting"), https://tinyurl.com/yc8auvnx at 1:02:09 (comments from new board members and Ms. Williams noting the members' concerns with the factual errors in *Stamped* and their desire to accommodate to the extent possible parental responsibility for their children's education). The decision to allow students to access the book only with parental permission was made after careful consideration and consultation, and in keeping with the Board's respect for parental authority over the education and upbringing of their children.  (*See* Ex. D, Garrison Decl., ¶ 14; Ex. H, Kelley Decl. ¶ 10; Ex. G, Haskett Decl. ¶ 10.)

The result of the Board's decision is that two copies of Stamped are now available in the District's high school libraries subject to parental consent: one copy at the Pickens High School Library and one copy at the Liberty High School Library. (*See* Ex. A, Preisig Decl. ¶ 5.) Students at other high schools within the District may request an intra-District Library loan through the librarian for Stamped if it is not available at their own high school.  (*See id.* ¶ 7.)

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). It is "never awarded as of right."  *Id.* at 24.  A preliminary injunction may be granted only if Plaintiffs make a clear showing that each of four factors are satisfied: "[1] that [plaintiff] is likely to succeed on the merits, [2] that [plaintiff] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that

an injunction is in the public interest." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009) (citation omitted). This test "becomes even more exacting when," as here, "a plaintiff seeks a preliminary injunction *that mandates action,* as contrasted with the typical form of preliminary injunction that merely preserves the status quo pending trial." *Vollette v. Watson*, No. 2:12-cv-231, 2012 WL 3026360, at *3 (E.D. Va. July 24, 2012) (citing *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir. 2004)) (emphasis in original); *Billups v. City of Charleston*, 194 F. Supp. 3d 452, 460 (D.S.C. 2016) (same).

<u>A<small>RGUMENT</small></u>

Preliminary injunctive relief is inappropriate because (1) Plaintiffs lack standing both to bring this lawsuit and to seek preliminary relief because they have not and cannot show a cognizable injury, much less an imminent one; (2) under the *Winter* test, Plaintiffs have not and cannot show that they face irreparable harm, that they are likely to succeed on the merits, or that the balance of equities and public interest weigh in their favor; and (3) prospective injunctive relief is unavailable against the District.

**I.     The Court should deny the Motion for Preliminary Injunction because Plaintiffs lack standing.**

Article III of the Constitution confines the federal courts to adjudicating actual "cases" and "controversies." *See Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011). "[S]tanding is an essential and unchanging part" of that case-or-controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" of standing has three elements. *Id. First*, the plaintiff must have suffered an "injury in fact," an invasion of a legally protected interest which is (a) "concrete and particularized," and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* (internal citations omitted). *Second*, there must be a causal connection between the injury and the conduct complained of—the injury must be fairly

traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Id.* (internal citations omitted). And *third*, it must be "likely," as opposed to merely "speculative" that the injury will be "redressed by a favorable decision." *Id.* at 561 (internal citations omitted.) Because Plaintiffs' allegations fail, at minimum, to satisfy the first element, Plaintiffs lack standing, and the Court should deny their Motion for Preliminary Injunction.

      **A.**    **Both the Supreme Court and the Fourth Circuit require a plaintiff to allege more than future intentions that might "some day" result in an alleged injury.**

In the Supreme Court's seminal case, *Lujan*, the plaintiff environmental organizations challenged the joint regulation of the Fish and Wildlife Service and the National Marine Fisheries Service, which required that federal agencies consult the Secretary of the Interior about threats to endangered species or their habitats caused by agency action only if that action was "taken in the United States or on the high seas." 504 U.S. at 558–59. The environmental organizations sought (1) a declaratory judgment that the joint regulation contradicted the language of the Endangered Species Act and (2) an injunction forcing the Services to expand their joint regulation to require consultation with the Secretary of the Interior about threats to endangered species and their habitats even when the agency action is to occur outside the United States. *See id.* The Secretary of the Interior moved to dismiss for lack of standing. *Id.* at 559. The district court did so, but the court of appeals reversed. *Id.*

In discussing the injury-in-fact requirement, the Supreme Court stated that the plaintiffs needed to submit evidence or affidavits establishing a sufficiently concrete, particularized, actual or imminent injury. *Id.* at 562–63. The environmental organizations had submitted affidavits of two members, Joyce Kelly and Amy Skilbred, in an attempt to establish that the Services' regulation would cause them to suffer the requisite injury. *Id.* at 563.

11

Ms. Kelly swore in her affidavit, which was filed in 1988, that she had "traveled to Egypt in 1986 and 'observed the traditional habitat of the endangered [N]ile crocodile there and intends to do so again, and hopes to observe the crocodile directly.'" *Id.* (quoting Ms. Kelly's affidavit) (alterations omitted). She also swore that when she returned, she would "'suffer harm in fact as the result of the American role in overseeing the rehabilitation of the Aswan High Dam on the Nile and in developing Egypt's Master Water Plan.'" *Id.* (quoting Ms. Kelly's affidavit) (alterations and omission omitted).

In Ms. Skilbred's affidavit, which was filed in 1988, she swore that "she traveled to Sri Lanka in 1981 and 'observed the habitat' of 'endangered species such as the Asian elephant and the leopard' at what is now the site of the Mahaweli project funded by the Agency for International Development." *Id.* (quoting Ms. Skilbred's affidavit) (alteration omitted). That project, she predicted, "'will seriously reduce endangered, threatened, and endemic species habitat including areas that I visited, which may severely shorten the future of these species.'" *Id.* (quoting Ms. Skilbred's affidavit) (alteration and omission omitted). Her desire to use and enjoy these endangered species will be harmed, Ms. Skilbred said, "because she 'intends to return to Sri Lanka in the future and hopes to be more fortunate in spotting at least the endangered elephant and leopard.'" *Id.* (quoting Ms. Skilbred's affidavit) (alternations omitted). When asked at her deposition "when she had any plans to return to Sri Lanka," Ms. Skilbred answered, "'I intend to go back to Sri Lanka,'" but "'I don't know when. There is a civil war going on right now. I don't know. Not next year, I will say. In the future.'" *Id.* at 563–64 (quoting Ms. Skilbred's deposition) (alteration omitted).

Those two affidavits, the Supreme Court found, "plainly contain no facts . . . showing how damage to the species will produce 'imminent' injury to Mses. Kelly and Skilbred." *Id.* at 564. The Court explained:

> [T]he affiants' profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough. Such "some day" intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the "actual or imminent" injury that our cases require.

*Id.* (second alteration in original). The Court continued:

> Although "imminence" is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending. It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control. In such circumstances we have insisted that the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all.

*Id.* at 564 n. 2 (citation omitted).

In *Doe v. Obama*, the Fourth Circuit interpreted, applied, and expounded on the Supreme Court's "some day intentions" language. 631 F.3d at 163. In that case, the plaintiffs asserted that parents who "are actively considering adopting" human embryos had standing to challenge Executive Order 13505 and the National Institutes of Health guidelines, which removed restrictions on research involving human embryonic stem cells. *Id.* at 159, 162. These parents claimed that "implementation of Executive Order 13505 will 'reduce the number of *in vitro* human embryos available for adoption' such that they will be unable to adopt." *Id.* at 162 (quoting Br. of Appellants at 53). The court concluded that this allegation was insufficient for the court to "infer that such injury would be 'actual or imminent.'" *Id.* (quoting *Lujan*, 504 U.S.

at 564).    The court explained, "*Lujan*'s requirement that plaintiffs have some concrete plan constrains us" because "[t]he plaintiff parents here did not allege that they have already tried and failed to adopt embryos, nor do they allege any concrete plans for future adoption, so the possibility that they will never suffer the alleged injury looms too large." *Id*. at 163.

The Eleventh Circuit has similarly interpreted the Supreme Court's "some day intentions" language in a case strikingly analogous to this one.  *See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1196–98 (11th Cir. 2009).   In that case, the ACLU of Florida sued a school board for removing *Vamos a Cuba* and other books in a series called "A Visit to" from a school district's libraries as a violation of their members' First Amendment rights to freedom of speech and access to information and their Fourteenth Amendment rights to due process.  *Id*. at 1188.   Mark Balzli, a member of that chapter of the ACLU, swore in his declaration that: (1) his son was a student at North Beach Elementary School; (2) he wanted his son to have access to *Vamos a Cuba* and the other books in the "A Visit to" series; (3) he saw *Vamos a Cuba* in the North Beach Elementary library; and (4) he had planned to check the book out of the library with his son "in the future," but they "will be unable to do so when school resumes on August 14, 2006" because of the school board's order removing the series.  *Id*. (internal citations omitted).   The court concluded that Mr. Balzli's declaration established an injury in fact as to *Vamos a Cuba* but not as to the other books in the "A Visit to" series.  *Id*. at 1195, 1197–98.

The court's analysis turned on whether Mr. Balzli's declaration evidenced that the anticipated injury would occur within some fixed period of time in the future.  *See id.* at 1194. The court observed that Mr. Balzli's declaration, which is dated July 5, 2006, states that he anticipated checking out *Vamos a Cuba* "when school resumes on August 14, 2006," and that

14

this showed a specific intention pegged to a sufficiently fixed period of time. *Id.* Thus, the court found that the injury alleged, unless redressed, would have occurred when Mr. Balzli and his son were prevented from checking out *Vamos a Cuba* after school resumed in six weeks, which satisfies *Lujan*'s immediacy requirement. *Id.* at 1194–95.

On the other hand, the court found that the plaintiffs' declarations did not carry their burden of showing that they face a threat of imminent injury from the removal of any of the other "A Visit to" books from the school district's libraries. *Id.* at 1197. The plaintiffs' declarations did not state, as Mr. Balzli's did about *Vamos a Cuba*, that there was a concrete plan to check out any of the other "A Visit to" books when school resumed. *Id.* at 1196. Instead, the court concluded that the plaintiffs' "declarations merely establish a free-floating desire to access the other books in the 'A Visit to' series, a desire untethered to any intended action during any reasonably specific period of time." *Id.* The court held that this free-floating desire was like the declarations in *Lujan*, where the Supreme Court found imminence to be lacking:

> Just as the *Lujan* plaintiffs' general desire to have wildlife preserved for their viewing someday was insufficient to establish an imminent injury in fact, the general desire of the plaintiffs in this case to have the other books in the "A Visit to" series kept in the school library for their use someday is insufficient as well. In both cases it is not enough to have an injury in fact. The injury must be imminent, and in both cases it was not.

*Id.*

**B.    Plaintiffs' declarations in this case express only a generic, inchoate desire potentially to read or study Stamped at some indefinite point in the future.**

Because the declarations in this case express only a free-floating desire to access *Stamped*, this Court should follow *Lujan*, *Doe*, and *ACLU of Fla., Inc.*, in finding that there are no allegations of an imminent injury and thus no standing.

The first declaration submitted by Plaintiffs in this case is from Shelia D. Crawford, the president of the Pickens County Branch of the NAACP. (*See* Declaration of Shelia D. Crawford ("Crawford Decl.") ¶ 1, ECF No. 7-2.) Ms. Crawford swears that the Pickens NAACP "represents members and children of members who attend school throughout the School District of Pickens County," (*id.* ¶ 3), and that "[m]embers of the Pickens NAACP are harmed by the District's removal of *Stamped* from all classrooms and libraries in the School District of Pickens County," (*id.* ¶ 4). She also swears that "[m]embers of the Pickens NAACP are denied the opportunity to receive the information, ideas, and viewpoints expressed in *Stamped*." (*Id.* ¶ 5.) Yet Ms. Crawford fails to identify a single member (or a member's child) who has suffered an actual or imminent injury because of the District's action to remove *Stamped*. Ms. Crawford does not swear that any member (or a member's child) had a specific intent to check out *Stamped* from a library in which *Stamped* had been available before August 22, 2022,[2] or to enroll in a class that used *Stamped* as part of its curriculum before August 22, 2022. Ms. Crawford's Declaration, therefore, does not fulfill Plaintiffs' burden of showing that the members of the Pickens County Branch of the NAACP face a threat of imminent injury from the District's actions. Because Ms. Crawford's Declaration fails the requirements of *Lujan* and cases applying it, the Court should find that the Pickens County Branch of the NAACP lacks standing.

The second declaration is from Rebecca Turner, the parent of two students who attend schools in the District. (*See* Declaration of Rebecca Turner ("Turner Decl.") ¶ 1, ECF No. 7-3.) One of her children is a rising tenth-grade student at D.W. Daniel High School, and another is a

---

[2] Even if Ms. Crawford were able to identify such a person, it would still be insufficient to establish constitutionally sufficient injury because high school students in the District again have access to *Stamped* in the library with parental permission. *See supra* at Background section IV. Nor can Plaintiffs in this suit assert a claim on behalf of some hypothetical person other than themselves.

rising eighth-grade student at R.C. Edwards Middle School. (*See id.*  ¶¶ 2–3.) Ms. Turner swears that the District injured her children in by depriving them of (1) the opportunity to engage with the text of *Stamped* with their classmates and teachers, (*see id.* ¶ 5), and (2) the opportunity to independently study *Stamped* by checking out *Stamped* from the school library (*id*. ¶ 7).  These allegations fail to meet *Lujan*'s imminence requirement for three reasons.

      *First*, Ms. Turner does not allege that either of her children had or have concrete plans to be enrolled in a class that studied *Stamped*.  Plaintiffs allege that *Stamped* was taught "as a companion text by English 3 (junior level American Literature) classes at D.W. Daniel High School." (Compl. ¶ 46, ECF No. 1.) Because neither of Ms. Turner's children is an eleventh-grade student enrolled in English 3 and there is no concrete plan for them to be enrolled in English 3, Ms. Turner's Declaration does not allege an actual or imminent injury relating to the District's removal of *Stamped* from its curriculum.  *See ACLU of Fla., Inc.*, 557 F.3d at 1196 ("a desire untethered to any intended action during any reasonably specific period of time" can never satisfy Article III's injury-in-fact imminence requirement).  *Second*, as to Ms. Turner's daughter who is about to begin the *eighth grade*, she would not have had an actual or imminent chance to read or study Stamped in the District's *high school* curriculum or libraries even before the Board's action challenged in this suit. *Third*, as of July 6, 2023, *Stamped* is available in the libraries of Pickens High School and Liberty High School with parental consent.  *Stamped* was never available in D.W. Daniel High School's library, but Ms. Turner's children (at least once they're both in high school) may access *Stamped* via interlibrary loan with her consent. (Ex. A, Preisig Decl. ¶¶ 6–7.) Thus, Ms. Turner has failed to allege an imminent injury, and, therefore, she lacks standing.

The third declaration is from Peter Laurence, the parent of two students who attend schools in the District.  (*See* Declaration of Peter Laurence ("Laurence Decl.") ¶ 1, ECF No. 7-4.)  One of his children is a rising tenth-grade student at D.W. Daniel High School, and another is a rising eighth-grade student at R.C. Edwards Middle School.  (*See id.* ¶¶ 2–3.)  Mr. Laurence's Declaration mirrors Ms. Turner's Declaration, swearing that the District deprived his children of "the opportunity to be exposed to the ideas, opinions, and viewpoints expressed in *Stamped* in an English classroom at D.W. Daniel High School and through independent study by checking out *Stamped* from the school library."  (*Id.* ¶ 4.)  Mr. Laurence has failed to allege an imminent injury for the same reasons as Ms. Turner and likewise lacks standing.

The fourth declaration is from Reba Kruse, the parent of two students who attend schools in the District.  (*See* Declaration of Reba Kruse ("Kruse Decl.") ¶ 1, ECF No. 7-5.)  Her children are rising twelfth-grade and tenth-grade students at Pickens High School, respectively.  (*See id.* ¶¶ 2–3.)  Ms. Kruse swears that the District has harmed her children by denying them (1) "access to self-guided exploration of the ideas in the book through a classroom or school library," (*id.* ¶ 8), and (2) "the opportunity for classroom discussion of [*Stamped*] with an experienced, qualified instructor," (*id.* ¶ 7).  Ms. Kruse's Declaration fails to allege an actual or imminent injury for two reasons.

*First*, as noted above, as of July 6, 2023, *Stamped* is available in the libraries of Pickens High School and Liberty High School with parental consent, mooting one of Ms. Kruse's alleged injuries.  *Second*, Ms. Kruse's children do not attend a school that ever used *Stamped* as part of its curriculum.  Plaintiffs allege that *Stamped* was used in English 3 at D.W. Daniel High School—not Pickens High School, which Ms. Kruse's children attend.  (Compl. ¶ 46, ECF No. 1.)  Further, Ms. Kruse does not allege that there were any concrete plans for *Stamped* to become

part of the curriculum at Pickens High School, nor does she swear that her children have definitive plans to enroll in D.W. Daniel High School's English 3 class. Ms. Kruse's Declaration is even less plausible than the affidavits of the plaintiffs in *Lujan* who wanted wildlife in Egypt and Sri Lanka preserved so that they could one day view it but had no concrete and definite plans to visit those countries. *See* 504 U.S. at 563–64. Here, Ms. Kruse wants the District to permit the use of *Stamped* in its schools' curricula even though her children do not even attend a school or class in which *Stamped* has been taught or will be taught. "Such 'some day' intentions— without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that [Article III] requires." *Id.* at 564. Thus, Ms. Kruse lacks standing.

Because none of the Plaintiffs have alleged an actual or imminent injury in fact, they lack standing, and the Court should deny Plaintiffs' Motion for Preliminary Injunction.

## II.    Alternatively, the Court should deny the Motion for Preliminary Injunction because the *Winter* factors favor the District.

A plaintiff seeking a preliminary injunction must establish that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7 (2008). Plaintiffs here have failed to show any of these.

### A.    Plaintiffs cannot show that they are likely to suffer irreparable harm in the absence of preliminary relief.

A preliminary injunction may not issue unless plaintiffs show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Real Truth About Obama, Inc.*, 575 F.3d at 346. That is because preliminary injunctions should be granted only in cases which "clearly demand" such interim relief. *See Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 811 (4th Cir. 1991). Plaintiffs have not suffered irreparable harm for two reasons.

19

*First*, on July 6, 2023, the Board voted to allow access to *Stamped* in the District's high school libraries subject to parental consent. On the first day of the school year, the student Plaintiffs can check out *Stamped*. Thus, Plaintiffs, as students or parents of children within the District, have suffered no harm at all regarding their claims that *Stamped* was unavailable in the District's high school libraries. *Second*, Plaintiffs' nine-month delay in seeking a preliminary injunction belies any claim that they are likely to suffer irreparable harm without preliminary relief.

When plaintiffs delay in seeking a preliminary injunction, they unwittingly betray that their situation is not a rare case that demands such an extraordinary remedy. *See Magnussen Furniture, Inc. v. Collezione Europa USA, Inc.*, 116 F.3d 472 (Table), at *3 n.6 (4th Cir. 1997) ("[T]here is little, if any, evidence suggesting that [Plaintiff] needs interim relief [because Plaintiff] knew about [Defendant's] table line when it was introduced in 1994 and did nothing. In fact, [Plaintiff] did not seek copyright protection for its own line of tables for an additional 16 months. Frankly, [Plaintiff's] purported need for immediate relief is belied by its own delay in bringing this action."); *see also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2nd Cir. 1985) ("Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction."); *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2nd Cir. 1985) ("Lack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm[.]"); *Skehan v. Bd. of Trustees of Bloomsburg State College*, 353 F. Supp. 542, 543 (M.D. Pa. 1973) ("Since an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required.").

Plaintiffs have asked this Court for a preliminary injunction to remedy an action that occurred on September 26, 2022. (*See* Pls.' Mem. L. Supp. Prelim. Inj., 4, ECF No. 7-1.) Yet Plaintiffs did not file their Complaint until seven months later—on April 26, 2023. (*See* Compl., ECF No. 1.) Further, Plaintiffs did not serve the Complaint on Defendants until May 26, 2023. (*See* Def.'s Waiver of Service, ECF No. 6.) Finally, Plaintiffs only moved this Court for a preliminary injunction on June 26, 2023—nine months after Plaintiffs allege that they were irreparably harmed. (*See* Pls.' Mot. Prelim. Inj., ECF No. 7.) The Fourth Circuit has held that a nine-month delay in seeking a preliminary injunction undermines the plaintiffs' argument that they were likely to suffer irreparable harm. *See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 79–80 (4th Cir. 1989). Courts in other jurisdictions have similarly denied requests for preliminary injunctions when plaintiffs have delayed in seeking such relief. *See*, *e.g.*, *Lydo Enterprises v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (finding grant of preliminary injunction to be an abuse of discretion because, inter alia, the plaintiff waited four months after notification of adverse zoning decision before bringing suit); *Brookhaven Housing Coalition v. Kunzig*, 341 F. Supp. 1026 (E.D.N.Y. 1972) (refused to issue preliminarily injunction and noting plaintiffs' year-long delay).

Because Plaintiffs waited nine months to seek a preliminary injunction, they are unlikely to show that they would suffer irreparable harm in the absence of preliminary relief, and the Court should deny Plaintiffs' Motion for Preliminary Injunction.

**B.    Plaintiffs are not likely to succeed on the merits.**

Plaintiffs argue that the District violated the First Amendment both by removing Stamped from the high school curriculum and by removing it from the high school libraries. They're wrong on both counts.

21

**1.    The Board's decision to exclude *Stamped* from the District's curriculum does not violate the First Amendment.**

The Supreme Court has recognized that school officials have broad authority to exercise control—including content-based control—over curriculum, if their actions are "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). In applying Supreme Court precedent, the Fourth Circuit has afforded broad discretion to public school boards when selecting and removing materials from curricula, even when those decisions are based on the content or viewpoint of the materials. *See Boring v. Buncombe County Bd. of Educ.* 136 F.3d 364 (4th Cir. 1998). Plaintiffs cannot skirt this black-letter law and are, therefore, unlikely to succeed on the merits of their claim.

**a.    Under *Hazelwood*, the Board has broad discretion to regulate the District's curriculum.**

In *Hazelwood*, the principal at a Missouri high school refused to allow a journalism class to publish two stories in the student newspaper about pregnant students and impact of divorce on students. 480 U.S. at 263–64. The principal had several concerns with the stories' publication, including that the stories were not age appropriate for the audience. *Id.* at 263. The Supreme Court reversed the lower court and sided with the school administration, holding that these facts did not involve the suppression of student speech on school premises, but, rather, involved a school's control of expressive activities that are "part of the school curriculum." *Id.* at 270–71.[3] It found that because the newspaper at issue was part of the curriculum, the school officials could exercise greater control over it. *Id.* at 271. The court concluded that "educators do not offend the

---

[3] The Court's distinction between *students'* expression (and its greater First Amendment protection as private speech) and a *school's* speech (which is subject to a greater degree of school control) rebuts Plaintiffs' repeated and erroneous reliance on student speech cases like *Tinker* in an effort to compel the District to use instructional materials of the Plaintiffs' choosing. (*See* Pls.' Mem. L. Supp. Prelim. Inj., 21–29, ECF No. 7-1.)

First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273.

In sum, the Supreme Court has held that, under the First Amendment, school districts have control over curricula as *school* speech, not *student* speech. Thus, the District has wide latitude under *Hazelwood* over the selection and removal of materials such as *Stamped* in its schools' curricula.

> **b.    The Fourth Circuit, applying *Hazelwood*, has consistently held that a public school's governing body may dictate the school's curricula without violating the First Amendment.**

The Fourth Circuit has also ruled on this issue and has consistently sided with the authority of public school boards and administrators to dictate the schools' curricula. *See, e.g.*, *Boring*, 136 F.3d at 370 ("[W]e are of opinion that plaintiff had no First Amendment right to insist on the makeup of the curriculum"). In *Boring*, the court held that a school's control over curriculum is not speech subject to First Amendment protections. *See* 136 F.3d at 369. *Boring* involved a high school teacher who chose a play for her advanced acting students to perform at a state competition, and, in preparation, had the students perform a scene from the play for an English class at the high school. *Id.* at 366. After a parent complained that the subject matter of the play was too mature for the students, the principal placed limitations on the play's contents for the competition and later requested the teacher's transfer from the school. *Id.* at 366–67. The teacher filed suit, alleging in part that the school violated her freedom of speech. *Id.* at 367.

Citing *Hazelwood*, the court took an expansive view of "curriculum," finding that curriculum includes school-sponsored publications, theatrical productions, and other expressive activities in addition to school curriculum "in a traditional classroom setting." *Id.* at 368 (citing *Hazelwood*, 484 U.S. at 271). The court also found that under the test set forth in *Hazelwood*,

that the school had a "legitimate pedagogical interest" in excluding the play. *Id.* at 370. Not only did the court reason that "pedagogical" refers broadly to anything "relating to teaching," but it also held that "makeup of the curriculum of [the school] is *by definition* a legitimate pedagogical concern." *Id.* (emphasis added) (citing to *Searcey v. Harris*, 888 F.2d 1314, 1319 (11th Cir. 1989), reaching the same conclusion). It ultimately held that "[i]n the case of a public school, in our opinion, it is far better public policy, absent a valid statutory directive on the subject, that the makeup of the curriculum be entrusted to the local school authorities[.]" *Id.* at 371.

Accordingly, under both Supreme Court and Fourth Circuit precedent, the District cannot be in violation of the First Amendment for exercising discretion over its schools' curricula because the selection and makeup of school curriculum is, by definition, a legitimate pedagogical concern.

### 2. The Board's decision to exclude *Stamped* from the District's libraries does not violate the First Amendment.

Plaintiffs also argue that the District violated the First Amendment by removing *Stamped* from the high school libraries. As an initial matter, Plaintiffs' claim on this issue is moot because they have access to the book in the high school libraries and, therefore, there is no immediate or irreparable injury for this court to prevent. On July 6, 2023, the Board voted to allow access to *Stamped* in the District's high school libraries subject to parental consent.[4]

But even if this Court does not find that Plaintiffs' claims (or, at minimum, the supposed immediacy of their alleged injury) are moot, their claim regarding the library finds no support in

---

[4] Plaintiffs may argue in Reply that the Board's July 6, 2023 decision does not defeat the immediacy of their alleged injury because the Board might remove the book from the high school libraries in the future. Such speculation is an insufficient basis to clearly establish immediate irreparable injury. And even if the Board were to make such a decision in the future, Plaintiffs are free at that time to refile a request for preliminary injunctive relief, which this Court—having already reviewed and gained familiarity with the facts and legal issues—could consider and resolve in relatively short order.

controlling precedent. Instead, it rests solely on a 1982 case which establishes no standard and has no precedential value. *See Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982).

      **a.**      **Despite Plaintiffs' reliance, *Pico* is not controlling precedent and is not dispositive on this case.**

The Supreme Court has addressed the issue whether a school district may remove books from a public school library only once, in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982). Plaintiffs rely heavily on this opinion, citing it repeatedly as if it were controlling law before finally (on page 26 of their memorandum) acknowledging that the opinion they rely on was a plurality opinion that garnered only three votes. *Pico* is not controlling precedent, and Plaintiffs cannot show that the District violated the First Amendment even under the most favorable standard articulated by the Supreme Court.

In *Pico*, a school board voted to remove nine books from the libraries of the school district's middle and high schools because they posed a "moral danger" to the students. *See* 457 U.S. at 857. Students at the school sued, claiming that the board violated their First Amendment rights by removing the books for "social, political, and moral" reasons. *Id.* at 865, 858–59. After the district court granted summary judgment for the school board, the Second Circuit reversed and remanded on the First Amendment claim. *Id.* at 859–60. The Supreme Court affirmed in a severely fractured decision.

The lead opinion by Justice Brennan was joined in full by only two justices (Justices Marshall and Stevens) and joined in part by Justice Blackmun. *Id.* at 855, 882. In total, seven Justices filed opinions in *Pico*, and the Court was divided four-four on the constitutional issue of the extent to which the First Amendment allows the school board discretion to remove books from a school library. The result is that "*Pico* is of no precedential value as to the application of

the First Amendment to these issues." *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (Former 5th Cir. 1982) (en banc) (plurality opinion of Hill, J.) (quoting *Pico*, 457 U.S. at 883 (White, J., concurring in the judgment)).  With numerous opinions and "no part of any of them gathering five votes from among the nine justices . . . *Pico* is a non-decision so far as precedent is concerned.  It establishes no standard." *See ACLU of Fla., Inc.*, 557 F.3d at 1200.

   *Pico* does not and cannot control here.  It does not establish a standard of review and has no precedential value for the First Amendment issue of whether school districts have discretion to remove books from their libraries.  Despite this, Plaintiffs' focus their attention to *Pico* and ask this Court to adopt a legal theory that is not established by any controlling precedent.  This is inappropriate for a motion for preliminary relief.  *See Cox v. Anderson*, C.A. No. 4:21-cv-3797-MGL-TER, 2023 WL 1482693, at *4 (D.S.C. Jan. 9, 2023) ("On an application for preliminary injunction, the court is not bound to decide doubtful and difficult questions of law or disputed questions of fact." (quoting *Gantt v. Clemson Agr. Coll. of S.C.*, 208 F. Supp. 416, 418 (W.D.S.C. 1962)); *see also Delaware Port Authority v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 923 (3rd Cir. 1974) (holding that because the case presented an unprecedented and difficult question of law, there was no clear likelihood or assurance that the Port Authority interests would prevail on the merits); *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, No. 98 CIV. 4998 (MBM), 2000 WL 1471557, at *6 (S.D.N.Y. Oct. 3, 2000) (finding that given the complex and novel questions of law presented in the case, plaintiffs failed to demonstrate a likelihood of success on the merits).

     **b.**  **Under any of these standards, the Board did not violate the First Amendment when it removed *Stamped* because it contained factual inaccuracies.**

   Even if this Court finds that Plaintiffs are entitled to the most favorable standard in *Pico*, Plaintiffs still cannot show that the District violated the First Amendment. The best-case scenario

for Plaintiffs is for this Court to adopt a standard that failed to attract even a majority in *Pico*: that school officials may not remove books from library shelves "simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872. But even if this standard applies, Plaintiffs *still* have not shown that the District violated the First Amendment if the District removed *Stamped* not for those prohibited reasons but for legitimate pedagogical reasons. *See*, *e.g.*, *ACLU of Fla., Inc.*, 557 F.3d at 1202.

As a threshold issue, Plaintiffs' have incorrectly and misleadingly asserted that the District "banned" *Stamped* from its libraries. This could not be further from the truth. Book banning "takes place where a government or its officials forbid or prohibit others from having a book." *Id*. at 1218 (citing *Webster's New Twentieth Century Dictionary* 144–45 (1976) (defining "ban" as "to prohibit" or "to forbid")); *see also Black's Law Dictionary* 154 (8th ed. 2004) (defining "ban" as "[t]o prohibit, esp[ecially] by legal means"). The term does not apply where a school district, through its school board, decides to remove a book from its own library shelves. *Id*. at 1219. The word "remove" means to "move from a place or position; take away or off." *Id*. (citing *Random House Unabridged Dictionary* 1630 (2d ed.1993)); *see also Black's Law Dictionary* 1322 (8th ed.2004) (defining removal as "[t]he transfer or moving of a ... thing from one location, position, or residence to another"). The District here did not "ban" *Stamped*. Students are still permitted to buy the book, own the book, check the book out from the public library, bring the book to school, or discuss the book with their friends. The District's selection of which books to include on its own library shelves is far from a "ban." *See C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F. Supp. 3d 906, 909 (E.D. Mo. 2022) (finding that it was "important at the outset for the Court to clarify something: this case does not

27

involve banning books . . . [n]owhere do Plaintiffs allege that the District has prohibited anyone from reading, owning, possessing, or discussing any book.  Rather, through a policy enacted by its elected school board, the District allows librarians to use their best judgment to remove books in select scenarios[.]"); *Presidents Council, District 25 v. Community School Board No. 25*, 457 F.2d 289 (2nd Cir.), cert. denied, 409 U.S. 998 (1972) ("The administration of any library, whether it be a university or particularly a public junior high school, involves a constant process of selection and winnowing based not only on educational needs but financial and architectural realities. To suggest that the shelving or unshelving of books presents a constitutional issue, particularly where there is no showing of a curtailment of freedom of speech or thought, is a proposition we cannot accept.")

Second, the District removed *Stamped* for legitimate pedagogical reasons, namely that *Stamped* contains factual and historical inaccuracies.  In *ACLU of Fla., Inc.*, the school board removed a book about Cuba from the school library because the board determined that it was not historically accurate. 557 F.3d at 1182.  The 11th Circuit reversed the lower court, holding that the school district did not violate the First Amendment, reasoning that the "school board could remove book based upon numerous factual inaccuracies and misleading omissions therein." *Id*. at 1177.  The court found that "[w]hatever else it prohibits, the First Amendment does not forbid a school board from removing a book because it contains factual inaccuracies, whether they be of commission or omission. There is no constitutional right to have books containing misstatements of objective facts shelved in a school library." *Id*. at 1202.

Similarly, in *Wentzville*, plaintiffs sought to enjoin a school district from removing eight books because they were not educationally suitable. *Id*. at 910–11.  The Court reasoned that *Pico* was not controlling but, like the *ACLU of Fla., Inc.* court, chose to adopt the more expansive

28

standard of review in *Pico* "to give [Plaintiffs] a fair chance of prevailing." *Id*. at 915.  The court noted that the "*Pico* plurality recognized local school boards have 'a substantial legitimate role to play in the determination of school library content' and that districts have 'significant discretion' to determine the books available in school libraries." *Id*. (citing *Pico*, 457 U.S. at 869–70). The central issue is whether the school district intended to deny students access to ideas with which they disagreed, and whether this intent was the "decisive factor" in their decision. *Id*. (citing *Pico*, 457 U.S. at 869–70).

The *Wentzville* court further found that "[t]his mens rea requirement necessarily means schools may remove books for numerous reasons. Indeed, if an intent to deny must be the *decisive* factor, schools may even remove books *partly* because they intend to deny students access to ideas with which they disagree." *Id*. (emphasis in original). The court ultimately denied plaintiffs' motion for preliminary injunction, holding that plaintiffs did not show that "the District intended to deny students access to ideas with which the District disagreed, let alone that the intent was the *decisive* factor in decision." *Id*. (emphasis in original).  The court focused on whether plaintiffs had sufficiently shown that the district's stated reason was a pretense and that the real decisive reason for the removal was to deny access to certain ideas. *Id*. at 917.

Here, Plaintiffs also have not shown that the District intended to deny students access to ideas with which it disagreed or that such intent was the decisive factor in its decision. The only reason given by Board members for voting to remove *Stamped* was because of its factual errors and omissions and, as a result, its lack of educational suitability.  *See* 8/22/22 Board Meeting at 1:56:18–1:59:23 (Ms. Williams explaining her concerns were with *Stamped*'s repeated factual errors and lack of educational rigor); (*see* Ex. D, Garrison Decl. ¶ 13; Ex. H, Kelley Decl. ¶ 9; Ex. G, Haskett Decl. ¶ 9; Ex. E, Swords Decl. ¶ 14). Plaintiffs make conclusory allegations that

Board members were influenced by public comments and political pressure but have shown no evidence that this was a deciding factor in their vote, much less the decisive factor. Indeed, Plaintiffs' conclusory allegations are contradicted by the record evidence before the Court.

The issue Board members had with *Stamped* was a specific concern about the book's factual inaccuracies, not with the ideas and contents therein. Contrary to Plaintiffs' assertions, the Board members do not object to including books, materials, ideas, or discussion in the curriculum and school libraries in the district regarding race, racism, slavery, the civil rights movement, and historic or contemporary issues and tensions regarding race, racism, and justice, as long as those books, materials, ideas, or discussions are intellectually appropriate, age appropriate, and educationally suitable for the students of the School District of Pickens County. (*See* Ex D, Garrison Decl. ¶ 12; Ex H, Kelley Decl. ¶ 8; Ex G, Haskett Decl. ¶ 8; Ex E, Swords Decl. ¶ 13; Ex. C, Bagley Decl. ¶ 14.)   The District's high school libraries contain books about contemporary issues of race, racism, the black experience in America, and police violence; books about slavery in America, including biographies and personal narratives of enslaved people; books about the abolition movement; books about the civil rights movement, including multiple books by or about Dr. Martin Luther King, Jr.; multiple books about Malcolm X, including his autobiography; books about black social leaders and activists; books about Karl Marx, socialism, communism; and over a dozen books by Jason Reynolds (the co-author of *Stamped*), including his novels exploring contemporary issues of race and racism in America. (*See* Ex. A, Preisig Decl. ¶ 9.)  These books represent a variety of perspectives and ideas—the District's high school libraries contain books that the author of *Stamped* recommends as reading for young adults interested in learning about race, racism, and antiracism in America. *See* Nat. Pub. Radio, *Ibram*

*X. Kendi Recommends 6 Books to Help Your Kids Understand Race* (June 21, 2021), *available at* https://tinyurl.com/pm7zmvjj; (Ex. A Preisig Decl. ¶ 10).[5]

Thus, Plaintiffs have not shown that the Board's motivations for removing *Stamped* were anything other than their stated concern that the book's factual errors and omissions rendered it intellectually inappropriate and educationally unsuitable for the District's high school libraries. The District therefore removed *Stamped* from its high school libraries for legitimate pedagogical reasons and did not violate the First Amendment even under the *Pico* standard, assuming it applies.

### C.    The balance of equities and the public interest do not favor issuing a preliminary injunction.

As discussed above, the alleged injury that Plaintiffs face is minimal.  In comparison, the injury an injunction would inflict on the District is considerable, and public interest favors the District in this case.

In considering the balance of the equities between the parties, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the relief requested." *Winter*, 555 U.S. at 24 (internal quotations omitted).  In cases involving significant public interest, courts may "consider the balance of equities and the public interest factors together." *Thomas v. Andino*, 613 F. Supp. 3d 926, 954 (D.S.C. 2020). Even if Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction, the court still must determine that the balance of the equities tips in their favor, "pay[ing]

---

[5] The District's high school libraries also carry several of the books the Carnegie Library's staff suggest for young adults on issues of race and justice. *See* Carnegie Library, *Race and Social Justice Books for Teens*, *available at* https://www.carnegielibrary.org/staff-picks/race-and-social-justice-fiction-for-teens/ (last visited July 10, 2023).

particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982).

Here, the requested injunction would profoundly alter the status quo, and the balance of equities, therefore, tips in the District's favor.  *See*, *e.g.*, *Wellin v. Wellin*, 2013 WL 6175829 (D.S.C. 2013) (refusing to grant preliminary injunction for plaintiffs in part because "the requested injunction would profoundly alter the status quo").  Granting an injunction here would give the Court the power to supersede the authority and considered discretion of the Board for the purpose of providing access to a book that is already available to the student Plaintiffs in the high school libraries and that is also available in multiple languages in hard copy, audio format, CD, and electronic download from Plaintiffs' local public libraries, local bookstores, and online retailers.

The District and its stakeholders also have an interest in maintaining local control of, and accountability for, the District and its schools by duly elected officials. The public interest is not served by an injunction that would invite more lawsuits from across the political and ideological spectrum seeking to use the federal courts as super-boards to second guess public school boards' curriculum and library decisions. Thus, the balance of equities and public interest do not favor the issuance of an injunction against the District.

III.    **Even if the *Winter* factors favored Plaintiffs, the Court should still deny the Motion for Preliminary Injunction because prospective injunctive relief is not available against the District.**

Even if Plaintiffs survive the arguments made in the preceding pages, the Court should still deny the Motion for Preliminary Injunction because the relief they seek is not available against the District.  Under the doctrine set forth in *Ex Parte Young*, 209 U.S. 123 (1908), state officials may be sued in their official capacities for prospective injunctive relief without violating the Eleventh Amendment.  *See Biggs v. North Carolina Dep't of Pub. Safety*, 953 F.3d 236, 242

(4th Cir. 2020). But that same doctrine does not extend to states or state agencies which act as arms of the state. *See id.*; *see also Alabama v. Pugh*, 438 U.S. 781 (1978) (holding that to the extent plaintiff's claims brought under § 1983 sought injunctive relief against a state agency rather than against state officials, the district court should have dismissed them); *Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244, 249 (4th Cir. 2012) (recognizing that a lawsuit for prospective injunctive relief must name state official as defendant, rather than state agency). Because the District is an arm of the state, the prospective injunctive relief Plaintiffs seek is unavailable against the District. *See Calef v. Budden*, 361 F. Supp. 2d 493, 497 (D.S.C. 2005) (ruling that, in the absence of a claim for injunctive relief specifically directed at state officials, the plaintiff's First Amendment claim asserted under § 1983 was barred by school district's Eleventh Amendment immunity); *Smith v. Sch. Dist. of Greenville Cnty.*, 324 F. Supp. 2d 786, 796 (D.S.C. 2004) ("[T]he Court is of the firm opinion that the relationship between the Defendant school districts and the state is so close and the laws of this state are such as to render the Defendant school districts as arms of the state for purposes of Eleventh Amendment sovereign immunity."). Other courts in this District have also considered the issue and have concluded that school districts in South Carolina are arms of the State for purposes of the Eleventh Amendment and are immune from suit, including the following: *Eldeco, Inc. v. Skanska USA Bldg., Inc*., 447 F. Supp. 2d 521 (D.S.C. 2006); *Stewart v. Laurens Cnty. Sch. Dist. No. 55*, No. 6–92–1603–3, 1992 WL 12014673, at *7 (D.S.C. Oct.2, 1992) (unpublished). These cases, therefore, bar suits seeking prospective relief from a state entity or agency.

## <u>CONCLUSION</u>

For the foregoing reasons, the District respectfully requests that Plaintiffs' Motion for Preliminary Injunction be denied.

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: <u>s/ Miles E. Coleman</u>
    Miles E. Coleman
    Fed. ID No. 11594
    2 West Washington Street, Suite 400
    Greenville, SC 29601
    miles.coleman@nelsonmullins.com
    (864) 373-2300