**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION**

| | |
|---|---|
| Pickens County Branch of the NAACP; | |
| Rebecca Turner and Brandon Turner, on behalf of minor children J.T. and G.T.; | |
| Susanna Ashton and Peter Laurence on behalf of minor children H.L. and C.L.; | Case No. 8:23-cv-01736-JDA |
| Reba Kruse and Derrick Kruse on behalf of minor children S.K. and R.K., | |
| Plaintiffs, | |
| v. | |
| School District of Pickens County, | |
| Defendant. | |

**SCHOOL DISTRICT OF PICKENS COUNTY'S
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Oral argument requested

NELSON MULLINS RILEY & SCARBOROUGH LLP

Miles E. Coleman
Fed. ID No. 11594
2 West Washington Street, Suite 400
Greenville, SC 29601
miles.coleman@nelsonmullins.com
(864) 373-2300

*Attorney for School District of Pickens County*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

PROCEDURAL BACKGROUND ................................................................................... 2

FACTUAL BACKGROUND .......................................................................................... 3

    I.      District parents objected to *Stamped*, initiating the District's review process.......... 4

    II.     The District Board voted to remove *Stamped* from the District's classrooms and libraries. ................................................................................................ 5

    III.    The District reinstated *Stamped* in its high school libraries subject to parental consent. ......................................................................................................... 6

    IV.    Plaintiffs' children have access to *Stamped* in the high school library and have either checked the book out or have declined the opportunity to do so. ................. 7

STANDARD OF REVIEW ............................................................................................. 9

ARGUMENT .............................................................................................................. 12

    I.      The case should be dismissed because Plaintiffs lack standing ............................ 12

          A.    Both the Supreme Court and the Fourth Circuit require a plaintiff to allege more than future aspirations that might "some day" result in an alleged injury. ...................................................................................... 12

          B.    Plaintiffs have not alleged facts that could support standing in this case. .................................................................................................... 16

               1.    Plaintiffs' Complaint fails to allege facts sufficient to establish standing. ............................................................................. 17

               2.    Plaintiffs' declarations, supplemental declarations, and supplemental memorandum are insufficient to demonstrate standing. ................................................................................... 18

               3.    Even if Plaintiffs had alleged a cognizable curricular injury, it is not redressable through the relief they seek ............................. 22

    II.     Plaintiffs' claim is moot to the extent it arises from the removal of *Stamped* from the District's libraries because the book has been reinstated. ....................... 23

    III.    The case should be dismissed because Plaintiffs' Complaint fails to state a viable claim. ................................................................................................. 26

          A.    The selection, curation, and management of public school curricula and library materials is government speech that the Free Speech Clause does not protect ............................................................................. 26

B.      The Board's decision to exclude *Stamped* from the District's curriculum does not violate the First Amendment. ................................... 27

     1.      Under *Hazelwood*, the Board has broad discretion to regulate the District's curriculum. .............................................................. 28

     2.      The Fourth Circuit, applying *Hazelwood*, has held that a public school's governing body may dictate the school's curricula without violating the First Amendment. ........................ 29

C.      Plaintiffs have not sufficiently alleged that the Board's decision to exclude *Stamped* from the District's libraries violates the First Amendment. ............................................................................................... 30

CONCLUSION .................................................................................................................... 34

### TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009) ...................................................................15, 17, 20, 31, 33

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................................11

*Beahn v. Gaoyles*,
  550 F. Supp. 259 (D. Md. 2021) .......................................................................................10

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................................................11

*Board of Educ. of Downers Grove Grade School Dist. No. 58 v. Steven L.*,
  89 F.3d 464 (7th Cir. 1996) ..............................................................................................25

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
  457 U.S. 853 (1982).............................................................................................30, 31, 33, 34

*Boring v. Buncombe County Bd. of Educ.*,
  136 F.3d 364 (4th Cir. 1998) .............................................................................22, 23, 28, 29

*Brantley v. Vaughan*,
  835 F. Supp. 258 (D.S.C. 1993).........................................................................................11

*Brooks v. Vassar*,
  462 F.3d 341 (4th Cir. 2006) .......................................................................................10, 24

*C.K.-W. by and through T.K. v. Wentzville R-IV School District*,
  619 F. Supp. 3d 906 (E.D. Mo. 2022)..........................................................................32, 33

*Clayland Farm Enterprises, LLC v. Talbot County, Maryland*,
  987 F.3d 346 (4th Cir. 2021) ......................................................................................10, 24

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*,
  68 F.4th 864 (4th Cir. 2023) (Heytens, J., concurring)......................................................25

*Doe v. Obama*,
  631 F.3d 157 (4th Cir. 2011) ......................................................................................12, 14

*Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.*,
  213 F.3d 175 (4th Cir. 2000) .............................................................................................11

*Friends of the Earth v. Laidlaw Env. Svcs*,
  528 U.S. 167 (2000).............................................................................................................10

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988)..............................................................................................28, 29

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984)......................................................................................................11

*Jonathan R. by Dixon v. Justice*,
    41 F.4th 316 (4th Cir. 2022) ....................................................................................24

*Katyle v. Penn Nat. Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ....................................................................................11

*Lighthouse Fellowship Church v. Northam*,
    20 F.4th 157 (4th Cir. 2021) ....................................................................................25

*Loftus v. F.D.I.C.*,
    989 F. Supp. 2d 483 (D.S.C. 2013)..........................................................................11

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)............................................................9, 12, 15, 16, 17, 19, 21

*Massachusetts v. Oakes*,
    491 U.S. 576 (1989)..............................................................................................11, 24

*Muir v. Ala. Educ. Television Comm'n*,
    688 F.2d 1033 (Former 5th Cir. 1982) (en banc)....................................................31

*Murphy v. Hunt*,
    455 U.S. 478 (1982)..................................................................................................24

*Papasan v. Allain*,
    478 U.S. 265 (1986)..................................................................................................11

*People for the Ethical Treatment of Animals v. Gittens*,
    414 F.3d 23, 28 (D.C. Cir. 2005).............................................................................26

*Pinkley, Inc. v. City of Fredrick*,
    191 F.3d 394 (4th Cir. 1999) .....................................................................................9

*Presidents Council, District 25 v. Community School Board No. 25*,
    457 F.2d 289 (2nd Cir.), cert. denied, 409 U.S. 998 (1972) ....................................32

*Richmond, Fredericksburg & Potomac R.R. v. United States*,
    954 F.2d 765 (4th Cir. 1991) ....................................................................................10

*Rosebrock v. Mathis*,
    745 F.3d 963 (9th Cir. 2014) ....................................................................................25

*Rosenfeld v. Montgomery Cnty. Pub. Sch.*,
    25 Fed. App'x 123 (4th Cir. 2001) ...........................................................................10

*Schatz v. Rosenberg*,
   943 F.2d 485 (4th Cir. 1991) ....................................................................11

*Searcey v. Harris*,
   888 F.2d 1314 (11th Cir. 1989) ...............................................................29

*Spencer v. Kemna*,
   523 U.S. 1 (1998)......................................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..................................................................................11

*Thomas v. City of Memphis, Tennessee*,
   996 F.3d 318 (6th Cir. 2021) ...................................................................25

*United States v. Am. Libr. Ass'n, Inc.*,
   539 U.S. 194, 205 (2003)..........................................................................26

*Warth v. Seldin*,
   422 U.S. 490 (1975)....................................................................................9

**Rules**

Fed. R. Civ. P. 12(b)(1)............................................................1, 9, 10, 34

Fed. R. Civ. P. 12(b)(6)..................................................................1, 11, 34

Fed. R. Civ. P. 12(h)(3)........................................................................1, 34

Local Civil Rule 7.04 D..............................................................................1

**Other Authorities**

7/6/23 Board Meeting, https://tinyurl.com/yc8auvnx ..................................7

8/22/22 Board Meeting, https://tinyurl.com/5hwze3y9 .....................5, 6, 34

9/26/22 Board Meeting, https://tinyurl.com/bdemmwwm.............................6

*Black's Law Dictionary* 154 (8th ed. 2004)..............................................32

*Black's Law Dictionary* 1322 (8th ed.2004)..............................................32

*Random House Unabridged Dictionary* 1630 (2d ed.1993).......................32

*Stamped: Racism, Antiracism, and You* ("*Stamped*") ...................... *passim*

*Webster's New Twentieth Century Dictionary* 144–45 (1976)....................32

Wright & Miller, *Federal Practice & Procedure* § 3533 (2d ed. 1984) ................10, 24

The School District of Pickens County (the "District") moves pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 12(h)(3) to dismiss Plaintiffs' suit because Plaintiffs lack standing, their claim is moot, and they have failed to state a cause of action on which relief can be granted.[1]

## INTRODUCTION

This lawsuit arises from the District's Board of Trustees' removal of the book *Stamped: Racism, Antiracism, and You* ("*Stamped*") from the curricula, library, and media centers of the District's high schools. Plaintiffs' suit must be dismissed for at least three independent reasons.

*First*, Plaintiffs lack standing. None of them has alleged a sufficiently concrete and particularized injury that is redressable by the Court as required to establish a constitutional case or controversy. The mere *possibility* that some of the Plaintiffs' children *might* read *Stamped* as an optional, supplemental text in English class or that they *might* want to check the book out from the high school library someday cannot satisfy their burden. This is especially true here because even if the Court were to grant the relief Plaintiffs seek, it *still* would not guarantee that Plaintiffs' children would get to study the book. That's because the selection of *Stamped* as an optional text rests in the discretion of individual English teachers—teachers who were not using *Stamped* in the years prior to the Board's vote. Accordingly, even if the Court granted the relief Plaintiffs seek and those teachers *could* use the book as an optional text, it is speculative to think that they *would* choose to use it. Speculation does not a redressable injury make.

*Second*, even if Plaintiffs had standing, they cannot maintain their claim that they are still suffering any injury from the Board's initial vote to remove *Stamped* from the District's high school libraries. That claim is moot because the Board subsequently modified that decision, and

---

[1] Pursuant to Local Civil Rule 7.04 D.S.C., a full explanation of the motion is provided herein, and, accordingly, a separate supporting memorandum would serve no useful purpose.

the book *is* available to Plaintiffs' children in the District's high school libraries. They already have the relief they seek—access to the book in the high schools' libraries. The claim regarding the library is moot, and they cannot salvage it by raising speculative or claims on behalf of others.

*Third*, even if Plaintiffs had standing and their claim was live, their suit should be dismissed because they failed to state a viable claim for relief. For one, the selection, curation, and management of public-school curricula and library materials are government speech not protected by the Free Speech Clause. Plaintiffs have no constitutional right to control government officials' and employees' decisions about the materials to be purchased with government funds and placed in government buildings to be used in a government program. The Fourth Circuit and courts across the country have recognized that public school boards have broad discretion to select and remove materials from school curricula, even when those decisions are based on the materials' content or viewpoint. And neither the Supreme Court nor the Fourth Circuit has ever adopted the test that Plaintiffs want for the curation of public school libraries. This Court shouldn't adopt it either.

Even if Plaintiffs were right about the legal test and standard they propose, the Complaint fails to allege sufficient nonconclusory facts to support a reasonable inference that the District violated that standard. Specifically, the legal test that Plaintiffs ask this Court to adopt requires them to allege (and later prove) that the decisive factor in the school board members' action was *their* intent to suppress ideas or viewpoints with which they disagree. Plaintiffs allege nothing of the sort other than conclusory assertions and speculation that *others*' motivations can be imputed to the Board. That is not enough to sustain a viable claim. The Court should dismiss the suit.

## PROCEDURAL BACKGROUND

Plaintiffs filed suit on April 26, 2023, seven months after the Board voted to remove *Stamped*. (*See* Compl., ECF No. 1.) Two months later, Plaintiffs moved for a preliminary

injunction.  (*See* ECF No. 7-1.) The parties briefed the Motion, and both sides submitted exhibits and declarations in support of their arguments. The Court heard oral arguments on July 21, 2023, and, at the conclusion of that hearing, denied Plaintiffs' Motion. (*See* Order, ECF No. 17.)

Plaintiffs appealed and moved for summary disposition of the appeal, arguing that the lower court's findings and conclusions were inadequate to allow substantive appellate review. The Fourth Circuit—without opining on the merits of the suit or the motion for preliminary relief—vacated the order and remanded for further proceedings.

On remand, the District Court requested, and the parties submitted, supplemental briefs to update the Court on the case. The case was transferred to Judge Austin in February 2024. Plaintiffs' Motion for a Preliminary Injunction remained pending at that time, as did Defendant's Motion to Dismiss. Both were later denied without prejudice (ECF No. 53). The parties subsequently notified the Court that they intended to continue prosecuting and defending the case. (ECF No. 55.) Plaintiffs stated they did not anticipate refiling their Motion for Preliminary Injunction, and the parties proposed a schedule for the District to refile and brief its Motion to Dismiss.  (*Id.*)  The Court adopted the proposed schedule (ECF No. 56), and this Motion is filed in accordance with it.

## FACTUAL BACKGROUND[2]

In 2020, some teachers in the District began using *Stamped*, by Ibram X. Kendi and Jason Reynolds, as an optional, supplemental text in the curriculum in some English 3 classes at D.W.

---

[2] The facts set out herein are drawn from the allegations of the Complaint and the documents relied on and incorporated by reference therein. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (noting a court may consider documents that are "integral to and explicitly relied on in the complaint" without converting a motion to dismiss into one for summary judgment).

In addition, to the extent that this Motion arises under Rule 12(b)(1) or 12(h)(3) for lack of standing and mootness, the facts set forth herein include those drawn from the parties' declarations and other exhibits. *See White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (noting that when ruling on a motion to dismiss for lack of standing, the court may consider evidence outside the pleadings without converting the motion to one for summary judgment).

Daniel High School. (*See* Compl. ¶ 46, ECF No. 1.) The book is intended for young adults and it "describes and deconstructs the history of racist thought in America." (*Id*. ¶ 1.) The authors (and Plaintiffs) emphasize that *Stamped* is not a normal history book. (*Id*. ¶¶ 25–26.) Rather, they say, it is a book about history written in furtherance of the authors' objective of exposing racist ideas in America. (*Id*. ¶¶ 26–30.)  Plaintiffs concede that, in pursuit of this goal, the authors of *Stamped* do not give a "neutral" account of history. (*Id*. ¶ 29.)

## I.    District parents objected to *Stamped*, initiating the District's review process.

In August 2022, three Pickens County parents formally expressed concerns regarding the use of *Stamped* at D.W. Daniel High School.  (Compl. ¶ 81, ECF No. 1.)  These concerns initiated a review process established by District policy. Specifically, the District's Policy Manual provides a procedure by which a parent or guardian may challenge a book used in a District school. (*Id.* ¶¶ 62–80; *see also* Policy IJ-R, ECF No. 9-3.) Under this procedure, a parent or guardian may complete a "Parent/Legal Guardian Request for Reconsideration of Instructional Materials" (a form known as "IJ-E"), which is sent to the superintendent, principal, and teacher whose material is under criticism. (Compl. ¶¶ 63–65, ECF No. 1.) The principal then appoints a school-level board of review, which completes a review of the challenged material and submits a written report of its findings to the principal. (*Id*. ¶¶ 66–70.) If the parent or guardian wishes to appeal the decision of the school-level board of review, she may request a review by a district-level committee. (*Id*. ¶ 71.) The District superintendent will then appoint a district-level board of review which completes a review and submits a written report. (*Id*. ¶¶ 73–80.)  Upon receipt of findings of the district-level committee, the parent or guardian may appeal the district-level committee decision to the District's Board of Trustees (the "Board"). (*Id*.) The Board will then make a final recommendation and decision concerning the complaint. (*Id*.) The Board evaluates and considers the two committees'

findings and conclusions but is not bound by them. (*See* Policy IJ-R, ECF No. 9-3.)

In August 2022, three parents submitted IJ-E forms objecting to the use of *Stamped* at D.W. Daniel High School.  (Compl. ¶ 81.)  One of the complainants appealed from the school-level committee to the district-level committee and, subsequently, to the Board.   (*Id.* ¶¶ 90–96.)

## II.    **The District Board voted to remove *Stamped* from the District's classrooms and libraries.**

On August 22, 2022, the Board held its monthly meeting and received public comments, most of which concerned the current challenge to the use of *Stamped* at D.W. Daniel High School. (*Id.* ¶¶ 97–98.) The Board heard public comments supporting and opposing the use of *Stamped*. (*Id.* ¶¶ 99–105; *see also* SDPC Board of Trustees Meeting (In-Person) — 8/22/22 ("8/22/22 Board Meeting"),  https://tinyurl.com/5hwze3y9,  at  1:10:50–1:41:50.)  Some  of  the  commenters expressed disagreement with the ideas or viewpoints in the book.  The Board's members, however, primarily listened. None disagreed with the book's ideas or viewpoints, and the Complaint does not allege otherwise. The only one who voiced her view of *Stamped* during that meeting explicitly explained that she disapproved of the book not because of its ideas or viewpoints, but because she found numerous factual errors when reading it and, as a result, determined it did not meet the standard of educational rigor required for the District's schools. (*Id*. at 1:56:18–1:59:23.[3])

---

[3] The Complaint distorts her comments, which are memorialized more accurately in the video that is quoted and incorporated by reference in the Complaint. Specifically, the Complaint cherrypicks her statement that she has "strong political leanings," and alleges "she agreed with two of the speakers," implying that she shared their objection to the *ideas* in *Stamped*. (Compl. ¶ 106, ECF No. 1.)

But that's not what she said. In reality, Ms. Williams noted that although she has political views, she subordinates them to her responsibility to listen to "every constituent" and to evaluate materials for educational suitability, and that she agreed with some commenters who—like her—had noted the *repeated factual errors and omissions* in the historical narrative presented in *Stamped*, which, in her view, raised a legitimate pedagogical concern that the book was not educationally suitable for use in the District. *See* 8/22/22 Board Meeting at 1:54:51–1:55:11; *id*. at 1:56:18–1:59:23.

On September 26, 2022, the Board held its monthly meeting and received the findings of the District-level book review committee. (Compl. ¶ 107, ECF No. 1.)  During this meeting, one Board member moved to allow access to *Stamped* only with parental consent, which received two votes. (*Id.* ¶¶ 118–19.) Ultimately, the Board voted to remove *Stamped* from the curriculum, library, and media centers of the District's high schools. (*Id.* ¶ 120.)

The video recordings of those meetings—recordings that are specifically referenced and incorporated in the Complaint—do not contain, and the Complaint does not allege, non-conclusory facts indicating that any member of the Board, much less a majority of the Board, were motivated by disagreement with the ideas or viewpoints expressed in *Stamped*. To the contrary, the Board's votes were not based on disagreement with the ideas contained in *Stamped*, but on the Board members' conclusions that, because of factual errors and omissions in the book, it was not intellectually appropriate or educationally suitable for students in the District. *See* 8/22/22 Board Meeting, https://tinyurl.com/5hwze3y9, at 1:56:18–1:59:23 (Ms. Williams: "I too read the book, most of it . . . I just found error after error after error.  Errors of omissions.  Errors of commission . . . . What we really need to focus on here is . . . does this material meet the educational rigor that's required for one of the best school systems in our state.").

## III.  The District reinstated *Stamped* in its high school libraries subject to parental consent.[4]

On July 6, 2023, the Board voted to allow access to *Stamped* in the District's high school libraries subject to parental consent.  (*See* Board of Trustees—Report of Findings (July 6, 2023), ECF No. 9-10.)  This decision mirrors a motion that was made during the Board meeting of

---

[4] Although the facts in this section and the next postdate the Complaint and are established by declarations outside of the Complaint, the Court may consider them without converting this Motion into one for summary judgment because they are relevant to Plaintiffs' lack of standing and the mootness of their claim. *See White Tail Park, Inc.*, 413 F.3d at 459.

September 26, 2022.  (*See* Declaration of Betty Garrison ("Garrison Decl.") ¶ 14, ECF No. 9-5; Declaration of Karla Kelley ("Kelley Decl.") ¶ 10, ECF No. 9-9; Declaration of Shannon Haskett ("Haskett Decl.") ¶ 10, ECF No. 9-8; Declaration of Betty Bagley ("Bagley Decl.") ¶ 16, ECF No. 9-4.) Since September 26, 2022, the Board had continued to discuss the issue, considered the perspectives of new Board members, and continued to evaluate input from parents and other stakeholders.  (*See* Garrison Decl., ¶ 14; Kelley Decl. ¶ 10); *see* SDPC Board of Trustees Meeting (Virtual) — 7/6/23 ("7/6/23 Board Meeting"), https://tinyurl.com/yc8auvnx at 1:02:09 (comments from new board members and Ms. Williams noting the members' concerns with the factual errors in *Stamped* and their desire to accommodate to the extent possible parental responsibility for their children's education). The decision to allow students to access the book only with parental permission was made after careful consideration and consultation, and in keeping with the Board's respect for parental authority over the education and upbringing of their children.  (*See* Garrison Decl., ¶ 14; Kelley Decl. ¶ 10; Haskett Decl. ¶ 10.)

The result of the Board's decision is that two copies of *Stamped* are now available in the District's high school libraries subject to parental consent: one at the Pickens High School Library and one at the Liberty High School Library. (*See* Declaration of Jessica Preisig ("Preisig Decl.") ¶ 5, ECF No. 9-2.)  Students at other high schools in the District may request an intra-District Library loan through the librarian if *Stamped* is not available at their high school.  (*Id.* ¶ 7.)

## IV.    Plaintiffs' children have access to *Stamped* in the high school library and have either checked the book out or have declined the opportunity to do so.

As noted above, after the appellate court remanded the case for further consideration of the then-pending motions, the District Court requested, and the parties submitted, supplemental briefs to update the Court on any factual developments. Plaintiffs filed a supplemental memorandum on December 1, 2023, alleging that several of their children had inquired at the school library about

checking out *Stamped* but had been told it was not available. (*See* Pls' Suppl. Mem., ECF No. 39.) In Plaintiffs' telling, this was a "gotcha" demonstrating that the District was allegedly out of compliance with the Board's prior vote to restore *Stamped* to the high school library subject to parental permission. (*Id*.)

The reality, however, was rather different than Plaintiffs' assertion. At that time, only four students (out of more than 4,000 high school students in the District) had asked to check out *Stamped*. (*See* District's Resp., ECF No. 43, and declarations in support thereof.) Three of those students were the Plaintiffs' children, each of whom inquired about the book on the day that Plaintiffs' supplemental memo was due, apparently at their parents' behest. (*Id*.) Two of the three did not even speak to a librarian. Instead, they asked a 14-year-old student assistant at the Daniel High School library if they could check out *Stamped*. (*Id*.) The library student assistant looked up the title in the card catalog but did not see the book in the Daniel High School library collection. She informed the boys that Daniel High School did not have a copy of the book. (*Id*.) The students left the library without speaking to the media specialist or any adult staff member. (*Id*.) *Stamped* is not—and has never been—housed in the Daniel High School library collection, and the teenage library student assistant was unaware that the District has an intra-District Library Loan procedure in which books may be requested from other District high schools and transferred to the requesting school. (*Id*.) After learning of this interaction, the Daniel High School principal and media specialist spoke individually with the two students who had requested to check out *Stamped* and explained that the book could be requested through an intra-District Library Loan with a completed parental permission form, which they provided to the students. Neither student returned with the signed form to check out the book. (*Id*.)

The third student, S.K., approached the librarian at Pickens High School on December 1, 2023, and was originally told she could not check out *Stamped* because she did not have a parental permission form. (*Id*.) Realizing that the student may not have been familiar with the parental permission form requirement, the librarian approached the student and informed her that if she brought in a parental permission form (which she provided to her), the student could check out the book. (*Id*.) In response, the student stated that her mother had asked her to inquire about the book's availability. (*Id*.) The student did not appear interested in checking out or reading the book herself, but the librarian gave her the form anyway, and the student returned to school on December 7, 2023, with the completed parental permission and checked out the book *Stamped*. (*Id*.)

The fourth student inquiry (and apparently the only genuine, unforced one) came from a student at Liberty High School who inquired with the librarian about the book and was immediately given a hard copy of the parental permission form to take home for parental signature.

In sum, Plaintiffs' children have access to *Stamped* in the school library. At least one of them has checked the book out—she has already received what she seeks in this lawsuit—and the others have declined to pursue the opportunity to check it out.

## STANDARD OF REVIEW

**Standing.** A motion to dismiss pursuant to Rule 12(b)(1) raises the fundamental question of whether a court has jurisdiction to adjudicate the matter before it. *See* Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Fredrick*, 191 F.3d 394, 399 (4th Cir. 1999). Federal courts have subject-matter jurisdiction only over justiciable cases or controversies. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992). Whether a plaintiff has standing to warrant the invocation of federal court jurisdiction presents a threshold question in every federal case. *Warth*

*v. Seldin*, 422 U.S. 490, 498 (1975). The burden of proving subject matter jurisdiction in response to a Rule 12(b)(1) motion to dismiss is on the plaintiff, the party asserting jurisdiction. *See Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

When the Rule 12(b)(1) motion challenge is raised not as to the sufficiency of the jurisdictional assertions in the plaintiff's complaint but to the underlying facts supporting those assertions, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id*. A court should grant a Rule 12(b)(1) motion to dismiss if the material jurisdictional facts are known and the moving party is entitled to prevail as a matter of law. *Id*.

**Mootness.** Another limitation on the Court's subject matter jurisdiction is the plaintiff's obligation to show that his claim remains "live" throughout the entirety of the proceeding. A plaintiff must demonstrate a concrete and particularized injury, causation, and redressability not only at the commencement of the case but also *at all times thereafter*. These elements "must continue to exist at every stage of review, or the action is moot." *Rosenfeld v. Montgomery Cnty. Pub. Sch*., 25 Fed. App'x 123, 130 (4th Cir. 2001); *see also Friends of the Earth*, 528 U.S. at 190; Wright & Miller, *Federal Practice & Procedure* § 3533 (2d ed. 1984). A court may consider extrinsic evidence when evaluating whether an issue or claim has been mooted by intervening events. *Beahn v. Gaoyles*, 550 F. Supp. 259, 270–71 (D. Md. 2021) ("[Q]uestions of mootness are properly considered pursuant to Federal Rule of Civil Procedure 12(b)(1)" and "the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.").

A legislative or administrative change to a statute, rule, or policy moots a pending lawsuit seeking declaratory and injunctive relief if the change has the effect of rescinding the challenged

decision or if it provides the plaintiff with the prospective relief he sought. *See*, *e.g.*, *Clayland Farm Enterprises, LLC v. Talbot County, Maryland*, 987 F.3d 346, 357–58 (4th Cir. 2021); *Brooks v. Vassar*, 462 F.3d 341, 347–49 (4th Cir. 2006). This is true even of a First Amendment claim and even when the legislative or regulatory body has the power to reenact the challenged statute or rule. *See Massachusetts v. Oakes*, 491 U.S. 576, 582 (1989).

**Failure to state a claim.** A motion to dismiss under Rule 12(b)(6) tests the complaint's legal sufficiency. *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.,* 213 F.3d 175, 180 (4th Cir. 2000) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)); *Brantley v. Vaughan,* 835 F. Supp. 258, 261 (D.S.C. 1993). The court must take the facts in the light most favorable to the plaintiff, but need not accept the legal conclusions drawn from the facts. *Eastern Shore Mkts.,* 213 F.3d at 175 (citing *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991)). The court need not accept "unwarranted inferences, unreasonable conclusions, or arguments" as true. *Id.* at 175.

A complaint must provide more than labels and conclusions to survive a 12(b)(6) motion to dismiss. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A mere recitation of the elements of a cause of action will not suffice. *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." *Id.* In that regard, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

When ruling on a motion to dismiss, courts may consider documents integral to the complaint or specifically referenced in it, even if not physically attached to the complaint. *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (citing *Tellabs, Inc. v. Makor Issues*

& *Rights, Ltd*., 551 U.S. 308, 322 (2007); *Loftus v. F.D.I.C.*, 989 F. Supp. 2d 483, 489 (D.S.C. 2013). Here, the relevant portions of the District's Policy Manual and the Board Meetings can and should be considered by the Court because they are expressly discussed, relied upon, incorporated by reference, and/or cited within the Complaint. (*See*, *e.g*., Compl. ¶¶ 62–80; 97–120, ECF No. 1.)

<u>ARGUMENT</u>

### I.     The case should be dismissed because Plaintiffs lack standing.

Article III of the Constitution confines the federal courts to adjudicating actual "cases" and "controversies." *See Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011). "[S]tanding is an essential and unchanging part" of that case-or-controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" of standing has three elements, each of which must be established. *Id*. First, the plaintiff must have suffered an "injury in fact," an invasion of a legally protected interest which is concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id*. (internal citations omitted). Second, there must be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Id*. Third, it must be "likely," not merely "speculative" that the injury will be "redressed by a favorable decision." *Id*. at 561. Because Plaintiffs' allegations fail to satisfy these elements, Plaintiffs lack standing, and the Court should dismiss their Complaint.

### A.     Both the Supreme Court and the Fourth Circuit require a plaintiff to allege more than future aspirations that might "some day" result in an alleged injury.

In the Supreme Court's seminal standing case, *Lujan*, the plaintiff environmental organizations challenged the joint regulation of the Fish and Wildlife Service and the National Marine Fisheries Service, which required that federal agencies consult the Secretary of the Interior

about threats to endangered species or their habitats caused by agency action only if that action was "taken in the United States or on the high seas." 504 U.S. at 558–59. The environmental organizations sought (1) a declaratory judgment that the joint regulation contradicted the language of the Endangered Species Act and (2) an injunction forcing the Services to expand their joint regulation to require consultation with the Secretary of the Interior about threats to endangered species and their habitats even when the agency action is to occur outside the United States. *See id.* The Secretary of the Interior moved to dismiss for lack of standing. *Id.* at 559. The district court did so, but the court of appeals reversed. *Id.*

In discussing the injury-in-fact requirement, the Supreme Court stated that the plaintiffs needed to submit evidence or affidavits establishing a sufficiently concrete, particularized, actual or imminent injury. *Id.* at 562–63. The environmental organizations had submitted affidavits of two members, Joyce Kelly and Amy Skilbred, in an attempt to establish that the Services' regulation would cause them to suffer the requisite injury. *Id.* at 563.

Ms. Kelly swore in her affidavit, which was filed in 1988, that she had previously "traveled to Egypt in 1986 and 'observed the traditional habitat of the endangered [N]ile crocodile there and intends to do so again, and hopes to observe the crocodile directly.'" *Id.* (quoting Ms. Kelly's affidavit) (alterations omitted). She also swore that if she returned to Egypt in the future, she would "'suffer harm in fact as the result of the American role in overseeing the rehabilitation of the Aswan High Dam on the Nile and in developing Egypt's Master Water Plan.'" *Id.* (quoting Ms. Kelly's affidavit) (alterations and omission omitted).

In Ms. Skilbred's affidavit, filed in 1988, she swore that previously "she traveled to Sri Lanka in 1981 and 'observed the habitat' of 'endangered species such as the Asian elephant and the leopard' at what is now the site of the Mahaweli project funded by the Agency for International

Development." *Id.* (quoting Ms. Skilbred's affidavit) (alteration omitted). That project, she predicted, "'will seriously reduce endangered, threatened, and endemic species habitat including areas that I visited, which may severely shorten the future of these species.'" *Id.* (quoting Ms. Skilbred's affidavit) (alteration and omission omitted). Her desire to use and enjoy these endangered species will be harmed, Ms. Skilbred said, "because she 'intends to return to Sri Lanka in the future and hopes to be more fortunate in spotting at least the endangered elephant and leopard.'" *Id.* (quoting affidavit) (alternations omitted). When asked at her deposition "when she had any plans to return to Sri Lanka," Ms. Skilbred answered, "'I intend to go back to Sri Lanka,'" but "'I don't know when. There is a civil war going on right now. I don't know. Not next year, I will say. In the future.'" *Id.* at 563–64 (quoting Ms. Skilbred's deposition) (alteration omitted).

Those two affidavits, the Supreme Court found, "plainly contain no facts . . . showing how damage to the species will produce 'imminent' injury to Mses. Kelly and Skilbred":

> [T]he affiants' profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough. Such "some day" intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the "actual or imminent" injury that our cases require.

*Id.* (second alteration in original). The Court continued:

> Although "imminence" is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending. It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control. In such circumstances we have insisted that the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all.

*Id.* at 564 n. 2 (citation omitted).

14

In *Doe v. Obama*, the Fourth Circuit interpreted, applied, and expounded on the Supreme Court's "some day intentions" language. 631 F.3d at 163. In that case, the plaintiffs asserted that parents who "are actively considering adopting" human embryos had standing to challenge Executive Order 13505 and the National Institutes of Health guidelines, which removed restrictions on research involving human embryonic stem cells. *Id.* at 159, 162. These parents claimed that "implementation of Executive Order 13505 will 'reduce the number of *in vitro* human embryos available for adoption' such that they will be unable to adopt." *Id.* at 162 (quoting Br. of Appellants at 53). The court concluded that this allegation was insufficient for the court to "infer that such injury would be 'actual or imminent.'" *Id*. (quoting *Lujan*, 504 U.S. at 564). The court explained, "*Lujan*'s requirement that plaintiffs have some concrete plan constrains us" because "[t]he plaintiff parents here did not allege that they have already tried and failed to adopt embryos, nor do they allege any concrete plans for future adoption, so the possibility that they will never suffer the alleged injury looms too large." *Id*. at 163.

The Eleventh Circuit has similarly interpreted the Supreme Court's "some day intentions" language in a case strikingly analogous to this one. *See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1196–98 (11th Cir. 2009). In that case, the ACLU of Florida sued a school board for removing *Vamos a Cuba* and other books in a series called "A Visit to" from a school district's libraries as a violation of their members' First Amendment rights to freedom of speech and access to information and their Fourteenth Amendment rights to due process. *Id*. at 1188. Mark Balzli, a member of that chapter of the ACLU, swore in his declaration that: (1) his son was a student at North Beach Elementary School; (2) he wanted his son to have access to *Vamos a Cuba* and the other books in the "A Visit to" series; (3) he saw *Vamos a Cuba* in the North Beach Elementary library; and (4) he had planned to check the book out of the library with

15

his son "in the future," but they "will be unable to do so when school resumes on August 14, 2006"
because of the school board's order removing the series.  *Id*. (internal citations omitted).  The court
concluded that Mr. Balzli's declaration established an injury in fact as to *Vamos a Cuba* but not as
to the other books in the "A Visit to" series.  *Id*. at 1195, 1197−98.

The court's analysis turned on whether Mr. Balzli's declaration evidenced that the
anticipated injury would occur within some fixed period of time in the future.  *See id.* at 1194.  The
court observed that Mr. Balzli's declaration, dated July 5, 2006, stated that he anticipated checking
out *Vamos a Cuba* "when school resumes on August 14, 2006," and that this showed a specific
intention pegged to a sufficiently fixed period of time.  *Id.*  Thus, the court found that the injury
alleged, unless redressed, would have occurred when Mr. Balzli and his son were prevented from
checking out *Vamos a Cuba* after school resumed in six weeks, which satisfies *Lujan*'s immediacy
requirement.  *Id.* at 1194−95.

On the other hand, the court found that the plaintiffs' declarations did not carry their burden
of showing that they face a threat of imminent injury from the removal of any of the other "A Visit
to" books from the school district's libraries.  *Id*. at 1197.  The plaintiffs' declarations did not state,
as Mr. Balzli's did about *Vamos a Cuba*, that there was a concrete plan to check out any of the
other "A Visit to" books when school resumed.  *Id*. at 1196.  Instead, the court concluded that the
plaintiffs' "declarations merely establish a free-floating desire to access the other books in the 'A
Visit to' series, a desire untethered to any intended action during any reasonably specific period of
time."  *Id.*  The court held that this free-floating desire was like the declarations in *Lujan*, where
the Supreme Court found imminence to be lacking.  *Id*.

**B.     Plaintiffs have not alleged facts that could support standing in this case.**

Because the Complaint and Plaintiffs' declarations contain no facts alleging anything other
than an inchoate desire to access *Stamped*, and because the materials before the Court indicate that

16

the alleged injury is not redressable by the relief sought in the Complaint, this Court should follow *Lujan*, *Doe*, and *ACLU of Fla., Inc.*, and conclude that Plaintiffs lack standing.

        1.     *Plaintiffs' Complaint fails to allege facts sufficient to establish standing.*

The Complaint contains a total of five paragraphs that allege anything related to Plaintiffs' standing in this case. (*See* Compl. ¶¶ 9–11; 146; 150, ECF No. 1.) The six individual Plaintiffs are Rebecca and Brandon Turner, on behalf of their minor children J.T. and G.T. (¶ 9); Susanna Ashton and Peter Laurence, on behalf of their minor children H.L. and C.L. (¶ 10); and Reba and Derrick Kruse, on behalf of their minor children S.K. and R.K. (¶ 11). Of the six children, only four were, at the time suit was filed, high school students. (*Id*.) Two of the high school students attended D.W. Daniel High School and two attended Pickens High School. (*Id*.)  Plaintiffs have not alleged facts sufficient to show that they have standing to challenge *Stamped*'s removal from either the D.W. Daniel High School English 3 curriculum *or* the District's school libraries and media centers.

First, Plaintiffs do not allege in the Complaint that any of the minor children are in tenth or eleventh grade or are enrolled in English 3 at D.W. Daniel High School, where *Stamped* was used as a companion text.  Further, even in their declarations and supplemental declarations (discussed below), which Plaintiffs submitted in an effort to shore up their standing, Plaintiffs do not allege that any of the minor children are or will be enrolled in an English 3 class at D.W. Daniel High *with a teacher* who has or will use *Stamped* as a companion text in the classroom.

Second, Plaintiffs do not allege that any of the minor children had or intended to check out or access *Stamped* in their school library.  They generally allege that "Pickens NAACP represents members and children of members who want to check out or otherwise access Stamped[.]" (*Id*. at 146.)  They allege that "these minor children are being denied their First Amendment right to access that information at D.W. Daniel High School and Pickens High School." (*Id*. at 150.)

17

Plaintiffs do not allege that any of the minor children had a specific intention to check out the book from their school library, only that they are generally denied access by the Board's removal.

> 2. *Plaintiffs' declarations, supplemental declarations, and supplemental memorandum are insufficient to demonstrate standing.*

Plaintiffs submitted several affidavits in support of their Motion for Preliminary Injunction for the purpose of establishing standing, all of which equally fail to include specific allegations capable of demonstrating standing. So too their supplemental brief filed after remand (ECF No. 39) and the declarations attached thereto do not establish (and, in fact, defeat) their standing.

The first declaration submitted by Plaintiffs in this case is from Shelia D. Crawford, the president of the Pickens County Branch of the NAACP. (*See* Declaration of Shelia D. Crawford ("Crawford Decl.") ¶ 1, ECF No. 7-2.) Ms. Crawford swears that the Pickens NAACP "represents members and children of members who attend school throughout the School District of Pickens County," (*id.* ¶ 3), and that "[m]embers of the Pickens NAACP are harmed by the District's removal of *Stamped* from all classrooms and libraries in the School District of Pickens County," (*id.* ¶ 4). She also swears that "[m]embers of the Pickens NAACP are denied the opportunity to receive the information, ideas, and viewpoints expressed in *Stamped*." (*Id.* ¶ 5.) Yet Ms. Crawford fails to identify a single member (or a member's child) who has suffered an actual or imminent injury because of the District's action to remove *Stamped*. Ms. Crawford does not swear that any member (or a member's child) had a specific intent to check out *Stamped* from a library in which *Stamped* had been available before August 22, 2022,[5] or to enroll in a class that used *Stamped* as part of its curriculum before August 22, 2022. Ms. Crawford's Declaration, therefore, does not

---

[5] Even if Ms. Crawford were able to identify such a person, it would still be insufficient to establish constitutionally sufficient injury because high school students in the District again have access to *Stamped* in the library with parental permission. *See supra* at Background section III. Nor can Plaintiffs in this suit assert a claim on behalf of some hypothetical person other than themselves.

fulfill Plaintiffs' burden of showing that the members of the Pickens County Branch of the NAACP face a threat of imminent injury from the District's actions. Because Ms. Crawford's Declaration fails the requirements of *Lujan* and cases applying it, the Court should find that the Pickens County Branch of the NAACP lacks standing.

The second declaration is from Rebecca Turner, the parent of two students who attend schools in the District. (*See* Declaration of Rebecca Turner ("Turner Decl.") ¶ 1, ECF No. 7-3.) One of her children was at that time a rising tenth-grade student at D.W. Daniel High School, and the other was a rising eighth-grade student at R.C. Edwards Middle School. (*Id.* ¶¶ 2–3.) Ms. Turner swears that the District injured her children in by depriving them of (1) the opportunity to engage with the text of *Stamped* with their classmates and teachers, (*id.* ¶ 5), and (2) the opportunity to independently study *Stamped* by checking out *Stamped* from the school library (*id*. ¶ 7). Her supplemental declaration adds that her minor child J.T. is a rising tenth grade student at D.W. Daniel High School enrolled in Honors English 3 for the 2023–2024 school year. (*See* Supplemental Declaration of Rebecca Turner ("Turner Supp. Decl." ¶¶ 2–3, ECF No. 13-2.) These assertions fail to meet *Lujan*'s imminence requirement for at least three reasons:

- *First*, Ms. Turner does not allege that either of her children had or have concrete plans to be enrolled in a class that studied *Stamped*. Plaintiffs allege that *Stamped* was taught "as a companion text by English 3 (junior level American Literature) classes at D.W. Daniel High School." (Compl. ¶ 46, ECF No. 1.) However, neither of her children are currently enrolled in an English 3 class at D.W. Daniel High School with a teacher who used *Stamped* as part of their curriculum last year, and she cannot show actual or imminent injury as a result. (*See* Declaration of Shannon Sharkey ("Sharkey Decl." ¶¶ 4–5, ECF No. 20-1.) The student identified as J.T. in Ms. Turner's Supplemental Declaration is a rising tenth grade student enrolled in Honors English 3 at D.W. Daniel High School for the second semester beginning in January 2024. (*Id*. at ¶ 4.) The teacher for the English 3 class that J.T. is enrolled in next Spring did not use *Stamped* as part of their curriculum last year. (*Id*. at ¶ 5.) The teacher's decision not to use *Stamped* as an optional, supplemental text in the Fall semester of last year was independent of and predated the Board's subsequent decision regarding the use of the book in the District. (*Id*.) Accordingly, Ms. Turner's Declaration does not allege a non-

19

speculative injury relating to the District's removal of *Stamped* from its curriculum. *See ACLU of Fla., Inc.*, 557 F.3d at 1196.

- *Second*, as to Ms. Turner's daughter who is about to begin the *eighth grade*, she would not have had an actual or imminent chance to read or study *Stamped* in the District's *high school* curriculum or libraries even before the Board's action challenged in this suit. Nor have (or could) any of the declarations indicated a concrete, specific plan for her to do so at a definite point in the foreseeable future.

- *Third*, even if Ms. Turners' children had the ability and definite plans to check out Stamped from the high school library, *they can*. As of July 6, 2023, *Stamped* is available in the libraries of Pickens High School and Liberty High School with parental consent. (*See* Preisig Decl. ¶ 5, ECF No. 9-2.)  *Stamped* was never available in D.W. Daniel High School's library, but Ms. Turner's children (at least once they're both in high school) may access *Stamped* via interlibrary loan with her consent. (*See* Preisig Decl. ¶¶ 6–7, ECF No. 9-2.) Thus, Ms. Turner has failed to allege an imminent injury, and, therefore, she lacks standing.

The third declaration is from Peter Laurence, the parent of two students who attend schools in the District.  (*See* Declaration of Peter Laurence ("Laurence Decl.") ¶ 1, ECF No. 7-4.)  One of his children was at that time a rising tenth-grade student at D.W. Daniel High School, and the nother was a rising eighth-grade student at R.C. Edwards Middle School.  (*See id.* ¶¶ 2–3.) His supplemental declaration adds that his then- rising tenth-grader was enrolled in English 3. (*See* Suppl. Decl. of Pater Laurance), ECF No. 13-1.) Mr. Laurence's declarations mirror Ms. Turner's, swearing that the District deprived his children of "the opportunity to be exposed to the ideas, opinions, and viewpoints expressed in *Stamped* in an English classroom at D.W. Daniel High School and through independent study by checking out *Stamped* from the school library."  (*Id.* ¶ 4.)  Mr. Laurence has failed to allege an imminent injury for the same reasons as Ms. Turner and likewise lacks standing. (*See* Sharkey Decl. ¶¶ 6–7, ECF No. 20-1 (noting that the student identified as H.L. in Peter Laurence's Supplemental Declaration was then a rising tenth grade student enrolled in Honors English 3 at D.W. Daniel High School for the second semester beginning in January 2024, and that the teacher for the English 3 class H.L. was enrolled in was

new to Daniel High School, and upon information and belief had not used *Stamped* as part of their curriculum in past years at previous schools).)

The fourth declaration is from Reba Kruse, the parent of two students who attend schools in the District. (*See* Declaration of Reba Kruse ("Kruse Decl.") ¶ 1, ECF No. 7-5.) Her children were then rising twelfth-grade and tenth-grade students at Pickens High School, respectively. (*Id.* ¶¶ 2–3.) Ms. Kruse swears that the District has harmed her children by denying them (1) "access to self-guided exploration of the ideas in the book through a classroom or school library," (*id.* ¶ 8), and (2) "the opportunity for classroom discussion of [*Stamped*] with an experienced, qualified instructor," (*id.* ¶ 7). Ms. Kruse's Declaration fails to allege an actual or imminent injury for at least two reasons:

- *First*, as noted above, as of July 6, 2023, *Stamped* is available in the libraries of Pickens High School and Liberty High School with parental consent, mooting one of Ms. Kruse's alleged injuries.

- *Second*, Ms. Kruse's children do not attend a school that ever used *Stamped* in its curriculum. Plaintiffs allege that *Stamped* was used in English 3 at D.W. Daniel High School—not Pickens High School, which Ms. Kruse's children attend. (Compl. ¶ 46, ECF No. 1.) Ms. Kruse does not allege there were any concrete plans for *Stamped* to be part of the curriculum at Pickens High School or that her children have definitive plans to enroll in D.W. Daniel High School's English 3 class. Her Declaration is even less plausible than the affidavits of the plaintiffs in *Lujan* who wanted wildlife in Egypt and Sri Lanka preserved so that they could one day view it but had no concrete and definite plans to visit those countries. *See* 504 U.S. at 563–64. Here, Ms. Kruse wants the District to permit the use of *Stamped* in its schools' curricula even though her children do not even attend a school or class where *Stamped* has been or will be taught.

"Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that [Article III] requires." *Id.* at 564. Ms. Kruse, like the other Plaintiffs, lacks standing.

>    3.    *Even if Plaintiffs had alleged a cognizable curricular injury, it is not redressable through the relief they seek.*

Even if Plaintiffs had alleged adequate facts to establish a constitutional injury capable of demonstrating standing, their alleged injury resulting from the alleged inability to study *Stamped* in English class is not redressable. Unless the Court is prepared to order specific high school teachers to choose and use one particular supplemental text over thousands of others—an Order that Plaintiffs have not requested and which, respectfully, would not be appropriate for the Court to issue[6]—the relief sought by the Complaint will not redress Plaintiffs' alleged curricular injury.

As noted above, the teachers in whose classes the Plaintiffs' children are enrolled for English 3 next semester did not use *Stamped* last year even prior to the controversy and Board vote. It is speculative to think that if they *could*, they *would*. When, as here, it is speculative that the relief sought would redress the alleged injury, a plaintiff lacks standing.

It is further speculative to think that these teachers would use the book in light of its documented historical errors, omissions, and distortions. (*See*, *e.g*., Declaration of Prof. David Bernstein, ECF No. 43-5.) Plaintiffs repeatedly claim that the book was not being taught as "history," and it could be used to show students how to read and evaluate "persuasive" writing and rhetoric, which are skills discussed in the relevant State standards. (*See* Compl. ¶¶ 36–45, 47.) However, none of the State standards that Plaintiffs cite suggest, much less encourage or require, that those standards be taught using a text containing objective, verifiable factual errors, omissions, and distortions. Indeed, the Fourth Circuit has recognized the legitimate authority of high school administrators to approve or disapprove of materials—even in *drama* class—based on their

---

[6] *Boring v. Buncombe County Bd. of Educ.* 136 F.3d 364, 371 (4th Cir. 1998) ("Someone must fix the curriculum of any school, public or private. In the case of a public school, in our opinion, it is far better public policy, absent a valid statutory directive on the subject, that the makeup of the curriculum be entrusted to the local school authorities . . .").

veracity and academic merit. *Boring v. Buncombe County Bd. of Educ.* 136 F.3d 364, 370 (4th Cir. 1998) (affirming school's authority to remove a drama based on its content, and noting in part that "'a young person cannot judge what is allegorical and what is literal' . . . 'The magistrate, who in favor of freedom thinks himself obliged to suffer all sorts of publications, . . . ought to be fearful of putting into the hands of youth writers indulgent to the peculiarities of their own complexion, lest they should teach the humors of the professor, rather then [sic] the principles of the science'").

Here, there is no reason to think that two teachers who didn't use *Stamped* last year would do so this year, particularly when its factual and historical defects are not necessary and not helpful in teaching the relevant standards. The relief Plaintiffs seek would not redress their injuries.

## II.     Plaintiffs' claim is moot to the extent it arises from the removal of *Stamped* from the District's libraries because the book has been reinstated.

Even if Plaintiffs *had* alleged a sufficiently definite intent to check out *Stamped* from the District's school libraries to establish standing, the Court should nevertheless dismiss their claim because their allegations and legal assertions regarding library access are moot. Plaintiffs cannot show injury and need no redress because the book is available to them (or, for the middle school children, would be available to them if they were in high school) on the very first day of school subject to parental permission. *See supra*, Factual Background, Part III.

Plaintiffs already have the thing they seek. The individual Plaintiffs—who were willing to wade into the waters of federal litigation to seek access to *Stamped* at school—would certainly permit their children to check out *Stamped* from their school library. The high schools that had copies of *Stamped* in their libraries before the Board's September 26, 2022 vote again have those copies in their libraries, and the students at the District's other high schools may access *Stamped* via interlibrary loan with her consent. (*See* Preisig Decl. ¶¶ 6–7, ECF No. 9-2.) Indeed, Plaintiffs' children and members currently have access to the book. At least one of them has actually checked

it out, while others have affirmatively been given a chance to do so but declined the opportunity. (*See* Factual Background, section IV, *supra*.)

In scenarios like this, a legislative or administrative change to a statute, rule, or policy moots a pending lawsuit seeking declaratory and injunctive relief if the change has the effect of rescinding the challenged decision or provides the plaintiff with the prospective relief he sought. *See Clayland Farm Enterprises, LLC v. Talbot County, Maryland*, 987 F.3d 346, 357–58 (4th Cir. 2021); *Brooks v. Vassar*, 462 F.3d 341, 347–49 (4th Cir. 2006); Wright & Miller, *Federal Practice & Procedure* § 3533.6 (2d ed. 1984). This is true even when the legislative or regulatory body has the power to reenact the challenged statute or rule. *Massachusetts v. Oakes*, 491 U.S. 576, 582 (1989) (holding that the amendment of a law prohibiting nude photography of minors mooted First Amendment overbreadth challenge to law); *Brooks*, 462 F.3d at 348 ("When a legislature amends or repeals a statute, a case challenging the prior law can become moot 'even where re-enactment of the statute at issue is within the power of the legislature.' [] Only if reenactment is not merely possible but appears *probable* may we . . . hold that the case is not moot.") (citations omitted).

Plaintiffs may respond by arguing that this case presents a scenario capable of repetition but evading review. That argument does not apply here and does not save Plaintiffs' claim. That's because it applies only if Plaintiffs can show that a future change is *likely* and would affect *these* Plaintiffs themselves. *See*, *e.g.*, *Jonathan R. by Dixon v. Justice*, 41 F.4th 316, 325 (4th Cir. 2022) (rejecting the plaintiff's "capable of repetition" argument and holding the claim was moot because there was no "'reasonable expectation that the same complaining party will be subject to the same action again.'") (citing *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)); *see also Murphy v. Hunt*, 455 U.S. 478, 482 (1982) ("The Court has never held that a mere physical or theoretical possibility was sufficient to satisfy the [capable-of-repetition] test . . . . Rather, we have said that there must

24

be a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party."); *Board of Educ. of Downers Grove Grade School Dist. No. 58 v. Steven L.*, 89 F.3d 464 (7th Cir. 1996) (rejecting the plaintiff's "capable of repetition" argument and holding that "[t]o fall within this exception, the alleged injury must be of inherently limited duration and likely to happen again to the same complaining party").

Plaintiffs have not shown and cannot show that their alleged injury (even assuming it is a constitutionally cognizable one) is likely to recur, is likely to affect them personally, or is of such limited duration that it would likely escape review. Nor can they show anything beyond conclusory attacks to support their allegation that the Board's reinstatement of *Stamped* was pretextual. To the contrary, the law establishes the *opposite* presumption. *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 889 (4th Cir. 2023) (Heytens, J., concurring) (noting the existence of a "presumption of legislative good faith" as to challenged policies); *Thomas v. City of Memphis, Tennessee*, 996 F.3d 318, 327 (6th Cir. 2021) (holding that government actors are entitled to a presumption of good faith in their policy changes); *Rosebrock v. Mathis*, 745 F.3d 963, 974 (9th Cir. 2014) ("We presume that a government entity is acting in good faith when it changes its policy).

Because Plaintiffs' high school children already have library access to *Stamped*, their claim is moot, and their alleged injury is not redressable. In the absence of a live claim and the need for and availability of judicial relief, it would be an impermissible advisory opinion for the Court to rule on the library issue. *See Lighthouse Fellowship Church v. Northam*, 20 F.4th 157 (4th Cir. 2021) (holding that when a lawsuit challenging certain governmental restrictions was still pending after those restrictions were lifted, the pending lawsuit was rendered moot because "the issues presented are no longer 'live'" and a court ruling in those circumstances would constitute an impermissible advisory opinion).

III.    **The case should be dismissed because Plaintiffs' Complaint fails to state a viable claim.**

Plaintiffs argue that the District violated the First Amendment both by removing *Stamped* from the high school curriculum and by removing it from the high school libraries. Plaintiffs fail to state a cause of action on both counts.

A.    **The selection, curation, and management of public school curricula and library materials is government speech that the Free Speech Clause does not protect.**

A public school's choice of some books for its curricula and libraries, and its rejection of others, is government speech. Courts have reached this conclusion in the context of public libraries, and that reasoning applies even more strongly in the context of public schools. *See generally People for the Ethical Treatment of Animals v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (hereinafter "*PETA*") ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude."); *see also United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 205 (2003) (plurality) (hereinafter "*ALA*") ("Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them.").[7] Selecting materials based on their "requisite and appropriate quality" necessarily means choosing some content and viewpoints while rejecting others, and the First Amendment allows this in the context of a public library (and, by implication, in the public school context, too). *See ALA*, 539 U.S. at 204–08. The First Amendment does not constrain a public school's collection decisions. *See generally Pleasant Grove City v. Summum*, 555 U.S.

---

[7] *See also ALA*, 539 U.S. at 204 (plurality) ("To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide to their patrons."); *id.* (a library's "goal has never been to provide 'universal coverage,'" but rather "to provide materials 'that would be of the greatest direct benefit or interest to the community'") (citation omitted); *id.* ("libraries collect only those materials deemed to have 'requisite and appropriate quality'"); *id.* at 208 ("A library's need to exercise judgment in making collection decisions depends on its traditional role in identifying suitable and worthwhile material[.]"); *id.* at 217 (Breyer, J., concurring in judgment) (referring to "the discretion necessary to create, maintain, or select a library's 'collection'").

460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.") (citations omitted).

When, as here, government officials determine how public funds and spaces will be used to present ideas and messages, those decisions constitute government speech. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467–72 (2009) (holding that a city's decision of what privately-created material it would select and display on public grounds "constitute[s] government speech" and was a government-controlled message" that involved the government "speak[ing] for itself"); *see also Sutliffe v. Epping School District*, 584 F.3d 314 (1st Cir. 2009) (rejecting the plaintiffs' Free Speech challenge and holding that when the government "uses its discretion to select between the speech of third parties for presentation" through government channels, that decision and selection constitutes government speech and "an expressive act by the government"); *Illinois Dunesland Preservation Soc'y v. Illinois Dept. of Natural Resources*, 584 F.3d 719, 721 (7th Cir. 2009) (rejecting the plaintiffs' Free Speech challenge and holding that the government's selection of which private messages to display or present to the public constitutes government speech); *PETA*, 414 F.3d at 28 (rejecting plaintiff's Free Speech claim and, analogizing to the library context, noting that "the government speaks through its selection of which books to put on the shelves and which books to exclude").

A public school's selection and curation of the materials to be included in its curricula and libraries are government speech. Accordingly, it is not regulated by the Free Speech clause of the First Amendment, and Plaintiffs' sole cause of action fails to state a viable claim.

**B.    The Board's decision to exclude *Stamped* from the District's curriculum does not violate the First Amendment.**

Even if a public school's selection and management of curricula were the type of speech to which the First Amendment applies, Plaintiffs still fail to state a viable claim related to the

removal of *Stamped* as an optional supplemental text from District classrooms. The Supreme Court has recognized that school officials have broad authority to exercise control—including content-based control—over curriculum if their actions are "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). The Fourth Circuit has afforded broad discretion to public school boards when selecting and removing materials from curricula, even when those decisions are based on the content or viewpoint of the materials. *Boring v. Buncombe County Bd. of Educ.* 136 F.3d 364 (4th Cir. 1998). Accordingly, and as explained more fully below, Plaintiffs have failed to state a claim on which relief may be granted.

1.     *Under* Hazelwood*, the Board has broad discretion to regulate the District's curriculum.*

In *Hazelwood*, the principal at a Missouri high school refused to allow a journalism class to publish two stories in the student newspaper about pregnant students and impact of divorce on students. 480 U.S. at 263–64. The principal had several concerns with the stories' publication, including that the stories were not age appropriate for the audience. *Id.* at 263. The Supreme Court reversed the lower court and sided with the school administration, holding that these facts did not involve the suppression of student speech on school premises, but, rather, involved a school's control of expressive activities that are "part of the school curriculum." *Id.* at 270–71. It found that because the newspaper at issue was part of the curriculum, the school officials could exercise greater control over it. *Id.* at 271. The court concluded that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. The District has wide latitude under *Hazelwood* over the selection and removal of materials such as *Stamped* in its schools' curricula. The exercise of that discretion does not violate the First Amendment.

28

2.     *The Fourth Circuit, applying* Hazelwood*, has held that a public school's governing body may dictate the school's curricula without violating the First Amendment*.

The Fourth Circuit has also ruled on this issue and has sided with the authority of public school boards and administrators to dictate the schools' curricula. *See Boring*, 136 F.3d at 369–70. *Boring* involved a high school teacher who chose a play for her advanced acting students to perform at a state competition, and, in preparation, had the students perform a scene from the play for an English class at the high school. *Id*. at 366.  After a parent complained that the subject matter of the play was too mature for the students, the principal placed limitations on the play's contents for the competition and later requested the teacher's transfer from the school. *Id*. at 366–67.  The teacher filed suit, alleging in part that the school violated her freedom of speech. *Id*. at 367.

Citing *Hazelwood*, the court took an expansive view of "curriculum," finding that curriculum includes school-sponsored publications, theatrical productions, and other expressive activities in addition to school curriculum "in a traditional classroom setting." *Id*. at 368 (citing *Hazelwood*, 484 U.S. at 271).  The court also found that under the test set forth in *Hazelwood*, that the school had a "legitimate pedagogical interest" in excluding the play. *Id.* at 370.  Not only did the court reason that "pedagogical" refers broadly to anything "relating to teaching," but it also held that "makeup of the curriculum of [the school] is *by definition* a legitimate pedagogical concern." *Id*. (emphasis added) (citing to *Searcey v. Harris*, 888 F.2d 1314, 1319 (11th Cir. 1989), reaching the same conclusion).  It ultimately held that "[i]n the case of a public school, in our opinion, it is far better public policy, absent a valid statutory directive on the subject, that the makeup of the curriculum be entrusted to the local school authorities[.]" *Id*. at 371.

Accordingly, under both Supreme Court and Fourth Circuit precedent, the District cannot be in violation of the First Amendment for exercising discretion over its schools' curricula because

the selection and makeup of school curriculum is, by definition, a legitimate pedagogical concern. That's particularly true when, as here, a Complaint alleges nothing but speculation and facts about *others'* motivations that could, if true, give rise to a viable claim. It's even more true when, as here, the evidence cited and incorporated into the Complaint indicates the opposite, namely that the Board had legitimate pedagogical concerns. *See supra* at 5 n.3 and accompanying text.

### C. Plaintiffs have not sufficiently alleged that the Board's decision to exclude *Stamped* from the District's libraries violates the First Amendment.

Plaintiffs also allege that the District violated the First Amendment by removing *Stamped* from the high school libraries. The Supreme Court has only once considered the issue of whether a school district may remove books from a public-school library. *See Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982).  *Pico's* fractured opinions provide no applicable, controlling precedent here, and Plaintiffs cannot show that the District violated the First Amendment even under the most favorable (to them) standard articulated by the Supreme Court.

In *Pico*, a school board voted to remove nine books from the district's middle and high school libraries because they posed a "moral danger" to the students. *See* 457 U.S. at 857.  Students at the school sued, claiming that the board violated their First Amendment rights by removing the books for "social, political, and moral" reasons.  *Id*. at 865, 858–59. After the district court granted summary judgment for the school board, the Second Circuit reversed and remanded on the First Amendment claim.  *Id*. at 859–60.  The Supreme Court affirmed in a severely fractured decision.

The lead opinion by Justice Brennan was joined in full by only two justices (Justices Marshall and Stevens) and joined in part by Justice Blackmun. *Id*. at 855, 882.  In total, seven Justices filed opinions in *Pico*, and the Court was divided four-four on the constitutional issue of the extent to which the First Amendment allows the school board discretion to remove books from

a school library.  The result is that "*Pico* is of no precedential value as to the application of the First Amendment to these issues." *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (Former 5th Cir. 1982) (en banc) (plurality opinion of Hill, J.) (quoting *Pico*, 457 U.S. at 883 (White, J., concurring in the judgment)).  With numerous opinions and "no part of any of them gathering five votes from among the nine justices . . . *Pico* is a non-decision so far as precedent is concerned.  It establishes no standard." *See ACLU of Fla., Inc.*, 557 F.3d at 1200.

  *Pico* does not and cannot control.  It does not establish a standard of review and has no precedential value for the First Amendment issue of whether school districts have discretion to remove books from their libraries.  Plaintiffs' claim, then, depends on this Court adopting a legal theory that is not established by any controlling precedent. (*See* Compl. ¶ 153, ECF No. 1.) Plaintiffs have not sufficiently alleged that the Board violated the First Amendment when it removed *Stamped*.

  Even if this Court finds that Plaintiffs are entitled to the most favorable (to them) standard in *Pico*, Plaintiffs still cannot show that the District violated the First Amendment. The best-case scenario for Plaintiffs is for this Court to adopt a standard that failed to attract even a majority in *Pico*: that school officials may not remove books from library shelves "simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872.  But even if this standard applies, Plaintiffs *still* have not plausibly alleged that the District violated the First Amendment if the District removed *Stamped* not for those prohibited reasons but for legitimate pedagogical reasons.  *See*, *e.g.*, *ACLU of Fla., Inc.*, 557 F.3d at 1202.

  As a threshold issue, Plaintiffs have incorrectly and misleadingly asserted that the District "banned" *Stamped* from its libraries. (Compl. ¶ 120, ECF No. 1.)  This could not be further from

the truth.  Book banning "takes place where a government or its officials forbid or prohibit others from having a book." *Id*. at 1218 (citing *Webster's New Twentieth Century Dictionary* 144–45 (1976) (defining "ban" as "to prohibit" or "to forbid")); *see also Black's Law Dictionary* 154 (8th ed. 2004) (defining "ban" as "[t]o prohibit, esp[ecially] by legal means").  The term does not apply where a school district, through its school board, decides to remove a book from its own library shelves. *Id*. at 1219.  The word "remove" means to "move from a place or position; take away or off." *Id*. (citing *Random House Unabridged Dictionary* 1630 (2d ed.1993)); *see also Black's Law Dictionary* 1322 (8th ed. 2004) (defining removal as "[t]he transfer or moving of a . . . thing from one location, position, or residence to another").  The District here did not "ban" *Stamped*. Students are still permitted to buy the book, own the book, check the book out from the public library, bring the book to school, or discuss the book with their friends.  The District's selection of which books to include on its *own* library shelves is far from a "ban." *See C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F. Supp. 3d 906, 909 (E.D. Mo. 2022) (finding that it was "important at the outset for the Court to clarify something: this case does not involve banning books . . . [n]owhere do Plaintiffs allege that the District has prohibited anyone from reading, owning, possessing, or discussing any book.  Rather, through a policy enacted by its elected school board, the District allows librarians to use their best judgment to remove books in select scenarios[.]"); *Presidents Council, District 25 v. Community School Board No. 25*, 457 F.2d 289 (2nd Cir.), cert. denied, 409 U.S. 998 (1972) ("The administration of any library, whether it be a university or particularly a public junior high school, involves a constant process of selection and winnowing based not only on educational needs but financial and architectural realities. To suggest that the shelving or unshelving of books presents a constitutional issue, particularly where there is no showing of a curtailment of freedom of speech or thought, is a proposition we cannot accept.")

Second, the only non-conclusory factual allegation pled in the Complaint alleges that the District's Board removed *Stamped* for legitimate pedagogical reasons, namely that *Stamped* contains factual and historical inaccuracies. *See supra* at 5 n.3 and accompanying text.  In *ACLU of Fla., Inc.*, the school board removed a book about Cuba from the school library because the board determined that it was not historically accurate. 557 F.3d at 1182.  The 11th Circuit reversed the lower court, holding that the school district did not violate the First Amendment, reasoning that the "school board could remove book based upon numerous factual inaccuracies and misleading omissions therein." *Id*. at 1177.  The court found that "[w]hatever else it prohibits, the First Amendment does not forbid a school board from removing a book because it contains factual inaccuracies, whether they be of commission or omission. There is no constitutional right to have books containing misstatements of objective facts shelved in a school library." *Id*. at 1202.

Similarly, in *Wentzville*, plaintiffs sought to enjoin a school district from removing eight books because they were not educationally suitable. *Id*. at 910–11.  The Court reasoned that *Pico* was not controlling but, like the *ACLU of Fla., Inc.* court, chose to adopt the more expansive standard of review in *Pico* "to give [Plaintiffs] a fair chance of prevailing." *Id*. at 915.  The court noted that the "*Pico* plurality recognized local school boards have 'a substantial legitimate role to play in the determination of school library content' and that districts have 'significant discretion' to determine the books available in school libraries." *Id*. (citing *Pico*, 457 U.S. at 869–70). The central issue is whether the school district intended to deny students access to ideas with which they disagreed, and whether this intent was the "decisive factor" in their decision. *Id*. (citing *Pico*, 457 U.S. at 869–70).

The *Wentzville* court further found that "[t]his mens rea requirement necessarily means schools may remove books for numerous reasons. Indeed, if an intent to deny must be the *decisive*

factor, schools may even remove books *partly* because they intend to deny students access to ideas with which they disagree." *Id*. (emphasis in original). The court ultimately denied the plaintiffs' motion for a preliminary injunction, holding that plaintiffs did not show that "the District intended to deny students access to ideas with which the District disagreed, let alone that the intent was the *decisive* factor in decision." *Id*. (emphasis in original).

Here, Plaintiffs have not plausibly alleged non-conclusory facts that, if true, would show that the District intended to deny students access to ideas with which it disagreed or that such intent was the decisive factor in its decision. The only reason given by Board members for voting to remove *Stamped* was because of its factual errors and omissions and, as a result, its lack of educational suitability. *See* 8/22/22 Board Meeting at 1:56:18−1:59:23 (Ms. Williams explaining her concerns were with *Stamped*'s repeated factual errors and lack of educational rigor). Plaintiffs make conclusory allegations that Board members were influenced by public comments and political pressure, but conclusory and speculative allegations cannot support their burden.

Thus, Plaintiffs have not plausibly alleged that the District removed *Stamped* from its high school libraries for anything other than legitimate pedagogical reasons, and have therefore failed to allege facts sufficient to support a claim that the District violated the First Amendment even under the *Pico* standard, assuming it applies.

## CONCLUSION

For the reasons stated above, this action should be dismissed because Plaintiffs lack standing under Fed. R. Civ. P. 12(b)(1), their claim is moot under Fed. R. Civ. P. 12(b)(1), the Court lacks subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and 12(h)(3), and Plaintiffs have failed to state a claim under Fed. R. Civ. P. 12(b)(6). Wherefore, the District respectfully

requests this Court enter an Order dismissing this action with prejudice and awarding such other

relief as this Court deems just and appropriate.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s Miles E. Coleman
     Miles E. Coleman
     Fed. ID No. 11594
     2 West Washington Street, Suite 400
     Greenville, SC 29601
     miles.coleman@nelsonmullins.com
     (864) 373-2300

     *Attorney for School District of Pickens County*

Greenville, South Carolina
October 28, 2024